**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| JULIA FARGIS,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN A. SCARLETT, ANDREW J. GRETHLEIN, MICHELLE J. ROBERTSON, FAYE FELLER, ANIL KAPUR, JAMES ZIEGLER, DAWN C. BIR, JOHN F. MCDONALD, SUSAN M. MOLINEAUX, ELIZABETH G. O'FARRELL, ROBERT J. SPIEGEL, V. BRYAN LAWLIS, and GAURAV AGGARWAL,<br><br>Defendants.<br><br>and,<br><br>GERON CORPORATION,<br><br>Nominal Defendant. | C.A. No. ____________<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**

Julia Fargis ("Plaintiff"), by her undersigned attorneys, derivatively on behalf of Nominal Defendant Geron Corporation ("Geron" or the "Company"), files this Verified Stockholder Derivative Complaint against John A. Scarlett ("Scarlett"), Andrew J. Grethlein ("Grethlein"), Michelle J. Robertson ("Robertson"), Faye Feller ("Feller"), Anil Kapur ("Kapur"), James Ziegler ("Ziegler"), Dawn C. Bir ("Bir"), John F. McDonald ("McDonald"), Susan M. Molineaux ("Molineaux"), Elizabeth G. O'Farrell ("O'Farrell"), Robert J. Spiegel ("Spiegel"), V. Bryan

Lawlis ("Lawlis"), and Gaurav Aggarwal ("Aggarwal") (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Geron.

Plaintiff alleges the following against the Individual Defendants based upon personal knowledge as to herself and her acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Geron, news reports, securities analysts' reports and advisories about the Company, information readily obtainable on the Internet, and public filings in the related federal securities class action lawsuit filed in the U.S. District Court for the Northern District of California captioned *In re Geron Corporation Securities Litigation,* 3:25-cv-02507-VC (N.D. Cal.) (the "Securities Action"), and all other publicly available information.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right, and for the benefit, of Geron against certain of its officers and directors seeking to remedy Defendants' violations of law that have occurred from at least February 28, 2024 to February 25, 2025 (the "Relevant Period"), and have caused, and continue to cause, substantial harm to Geron and its shareholders, including monetary losses and damages to Geron's reputation and goodwill.

2. Geron is a commercial-stage biopharmaceutical company that specializes in the development of therapies for the treatment of cancer. Geron's primary product is imetelstat, which is marketed under the brand name Rytelo. Rytelo is a telomerase inhibitor intended for the treatment of hematologic malignancies, including lower-risk myelodysplastic syndromes and myelofibrosis.

3. On June 6, 2024, the Company obtained approval from the U.S. Food and Drug Administration ("FDA") for Rytelo for the treatment of adult patients with transfusion-dependent ("TD") anemia. The approved indication encompassed patients with low- to intermediate-1 risk myelodysplastic syndromes ("MDS") who require four or more units of red blood cell transfusions over an eight-week period and who have not responded to, have lost response to, or are ineligible for erythropoiesis-stimulating agents ("ESAs").

4. During the Relevant Period, certain directors and officers of the Company disseminated materially false and misleading statements and failed to disclose material adverse information required to make those statements not misleading. Among other things, Defendants did not reveal that: (i) Geron's internal sales data showed that Rytelo sales and sales growth began to flatten in September 2024 and remained flat thereafter; (ii) Rytelo's early revenue was driven largely by a bolus of later-line patients treated by academic physicians as a last-resort therapy, rather than by first- and second-line patients; (iii) community physicians, who Defendants claimed accounted for roughly two-thirds of Rytelo patients, were not prescribing Rytelo in meaningful numbers because Geron had failed to educate them and lacked clear messaging and positioning for the drug; and (iv) as a consequence of the foregoing, the Company materially overstated Rytelo's commercial prospects, and the Individual Defendants' favorable representations regarding the Company's business, operations, and future prospects were materially misleading and lacked a reasonable basis throughout the Relevant Period.

5. These problems were apparent from the start. According to former employees, Rytelo's June 2024 launch was chaotic: Geron had no cohesive launch plan, no marketing materials, insufficient sales and medical staff, and no clear messaging about where Rytelo fit in treatment, and it had not adequately educated the community physicians who were expected to be

Rytelo's primary prescribers. Within weeks, Geron began overhauling its commercial leadership, announcing in July 2024 that Defendant Kapur would depart as Chief Commercial Officer and appointing Defendant Ziegler to that role in September 2024 to address Rytelo's lack of sales growth.

6. Defendants knew the truth. Geron's executive team, including Defendants Scarlett and Ziegler, received Rytelo's weekly sales data by email, broken down by national, regional, territory, and account sales, and Geron also received monthly data showing Rytelo sales by line of treatment. Ziegler also had access to a dashboard of daily demand data from Geron's specialty distributors. According to former Geron employees, that data showed that from launch Rytelo's sales consisted largely of a bolus of later-line patients, and that sales and sales growth began to flatten around September and October 2024 and remained flat through the end of the Relevant Period. Ziegler acknowledged the slowdown at an October 2024 quarterly business review meeting, recruited a senior sales executive that same month to help restart Rytelo's sales growth, and in January 2025 told Geron's sales force that Rytelo sales had flattened.

7. On February 26, 2025, the truth emerged when the Company announced its fourth quarter and full year 2024 financial results, revealing that Geron had "observed flat revenue trends over the last few months." Defendant Ziegler further admitted that "the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than our expectations," and claimed—contrary to Geron's own sales data, which showed that the flattening had begun in September 2024, well before Thanksgiving—that, based on Geron's rolling four- and eight-week sales data, the flattening began "around the holidays, Thanksgiving holiday going forward."

8. Upon the disclosure of this information, the market price of Geron common stock

fell sharply, declining 32.07% in a single trading day, from a closing price of $2.37 per share on February 25, 2025, to a closing price of $1.61 per share on February 26, 2025.

9. To make matters worse, while Geron's stock price was artificially inflated, the Individual Defendants personally profited. While in possession of material non-public information, Defendants Grethlein and Feller, Geron's Chief Operating Officer and Chief Medical Officer, sold approximately $4.4 million of their own Geron stock during the Relevant Period, and Defendant Kapur, then Geron's Chief Commercial Officer, sold approximately $1.96 million more, weeks before the Company announced his departure. In total, the Insider Selling Defendants (defined below) reaped approximately $6.37 million in gross proceeds before the truth was revealed.

10. As a result of the foregoing, Geron and Defendants Scarlett and Ziegler were named as defendants in the Securities Action.

11. On August 13, 2026, Judge Vince Chhabria issued an order denying the defendants' motion to dismiss the Second Amended Complaint in the Securities Action (the "Order")[1].

12. In the Order, the court held that the plaintiffs in the Securities Action had adequately alleged that the defendants' statements on three occasions—the November 7, 2024 third-quarter earnings call, the November 18, 2024 Stifel Healthcare Conference, and the December 4, 2024 Evercore Conference—representing that overall fourth-quarter growth and Rytelo's uptake across patient segments continued to look promising were false or misleading when made. Order at 1–2. The court credited allegations that contemporaneous sales data showed by November 2024 that Rytelo's early revenue was largely driven by a "bolus of later-line patients

[1] *Dabestani et al. v. Geron Corporation, et al.* No. 3:25-cv-02507-VC, Order Denying Motion to Dismiss SAC (N.D. Cal. Aug. 13, 2026).

with no other treatment option," and that sales growth had flattened before November 2024. *Id*. at 2. The court further held that the plaintiffs had adequately alleged scienter, finding the allegations "sufficient to allege that Ziegler knew that sales had slowed before November 2024," and reasoning that, because Geron's "core operations" centered on Rytelo's commercial success, it could be inferred that other Geron executives were also aware that sales had slowed in the fall of 2024. *Id*. at 2–3.

13. Due to the breaches of fiduciary duty by the Individual Defendants, most of whom are current directors of Geron, the collective engagement in fraud and misconduct, and the substantial likelihood of their liability in this derivative action and the Securities Action, a majority of Geron's Board of Directors cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

14. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of Section 14(a) of the Exchange Act (15 U.S.C. § 78n(a)) and Rule 14a-9 (17 C.F.R. § 240.14a-9) promulgated thereunder by the SEC.

15. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16. In connection with the acts, conduct, and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

17. This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18. This Court has personal jurisdiction over each Defendant named herein because each Defendant is either a corporation that conducts business in this District and is incorporated under the laws of Delaware or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

19. Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because Defendants have conducted business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District and Geron is incorporated in Delaware.

## PARTIES

***Plaintiff***

20. Plaintiff is, and has been at all relevant times, a shareholder of Geron.

***Nominal Defendant***

21. Nominal Defendant Geron is incorporated under the laws of Delaware, with its principal executive office located at 919 East Hillsdale Blvd., Suite 250, Foster City, California. Geron common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "GERN."

### Individual Defendants

***Director Defendants***

22. **Defendant Bir** has served as a director of the Company's Board since March 2019 and as Interim President and Chief Executive Officer ("CEO") from March until August 2025. Bir currently is the Chair of the Nominating and Corporate Governance Committee, and a member of

the Compensation Committee.

23. The Company's 2026 Proxy Statement stated the following about Defendant Bir:

> **Dawn C. Bir** has served as a director of Geron since March 2019 and as our Interim President and Chief Executive Officer from March until August 2025. Ms. Bir has served as a member of the board of directors of Cassava Sciences, Inc., a biotechnology company focused on developing novel, investigational treatments for central nervous system disorders, since October 2025, and of Soleno Therapeutics, Inc., a biopharmaceutical company developing novel therapeutics for the treatment of rare diseases, since August 2024. Previously, Ms. Bir served as the Chief Commercial Officer of Reata Pharmaceuticals, Inc., a biopharmaceutical company where she led marketing, market access, sales, and commercial operations, from September 2016 until Reata's acquisition by Biogen, Inc. in September 2023. From February 2013 to September 2016, Ms. Bir served as Vice President of Sales with Pharmacyclics LLC, an AbbVie company, where she built and led their first hematology national sales organization, and was responsible for the launch of IMBRUVICA® in the United States and Puerto Rico. From October 2011 to February 2013, Ms. Bir served as Vice President of Sales & Marketing of SKY Pharmaceuticals Packaging, Inc. & Rx Pak, a unit within the U.S. pharmaceutical and specialty solutions division of McKesson Corporation, a global healthcare company, where she was responsible for two companies and revenue centers, and led multiple functions, including sales, marketing, contract management, project management and customer service. From 1996 to October 2011, Ms. Bir held several commercial and sales positions of increasing responsibility within Genentech, Inc., a member of the Roche Group, a global pharmaceutical company, and Bristol Myers Squibb Company, a global pharmaceutical company. Ms. Bir holds a B.S. in Biology from Binghamton University.

24. According to the Proxy Statement filed for the fiscal year 2024, Defendant Bir received $583,314 in compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Option Awards ($) | Total Compensation ($) |
|---|---|---|---|
| **2024** | 64,158 | 519,156 | 583,314 |

25. According to the Proxy Statement filed for the fiscal year 2025, in fiscal year 2025, which included the period in which Defendant Bir served as the Interim President and CEO of the Company, Bir received $522,122 in total compensation from the Company, including for her service as a director.

| Fiscal Year | Salary ($) | Option Awards ($) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|
| **2025** | 318,190 | 163,674 | 40,258 | 522,122 |

26. As of March 1, 2025, Defendant Bir beneficially owned 606,000 shares of Geron common stock. Based on Geron's stock price of $1.76 per share on that date, Bir's beneficially owned shares had a market value of approximately $1,066,560. By March 26, 2026, Bir beneficially owned 966,000 shares of Geron common stock. Based on Geron's stock price of $1.54 per share on that date, Bir's beneficially owned shares had a market value of approximately $1,487,640.[2]

27. **Defendant McDonald** has served as a director of the Company's Board since September 2022 and is currently a member of the Audit Committee.

28. The Company's 2026 Proxy Statement stated the following about Defendant McDonald:

> **John F. McDonald** has served as a director of Geron since September 2022. Since October 2018, Mr. McDonald has served as Vice President, Business Development and Mergers and Acquisitions, for Novo Nordisk A/S, a global pharmaceutical company, where he leads business development and merger and acquisition activities, investment strategies and participates in the creation of research, early development, and therapeutic pipeline diversification and augmentation strategies. From 2011 to 2018, Mr. McDonald was Vice President, Business Development, at Biogen Inc., a biopharmaceutical company, where he led business development and negotiated numerous strategic alliances, licenses and acquisitions. From 2006 to 2011, Mr. McDonald served as Managing Director at MPM Capital LP, an investment firm, where he served as the primary business development and asset strategy resource for multiple portfolio companies. Prior to 2006, Mr. McDonald held business development, corporate strategy, and legal roles of increasing responsibility at various biopharmaceutical companies, including at Millennium Pharmaceuticals Inc., a biotechnology company (now a Takeda Oncology Company, a pharmaceutical company), Genzyme Corp., a biopharmaceutical

[2] Valuations of the Individual Defendants' holdings of Company stock are calculated using the closing price of Geron common stock of $1.76 per share on February 28, 2025 (the last trading day before March 1, 2025, the date as of which the 2025 Proxy Statement reported beneficial ownership), and the closing price of Geron common stock of $1.54 per share on March 26, 2026.

> company (now part of Sanofi, a pharmaceutical company) and Genentech, Inc., a biopharmaceutical company (now a member of the Roche Group, a pharmaceutical company). In those roles, Mr. McDonald developed relationships with numerous academic institutions, as well as biotechnology and pharmaceutical companies of all stages. Mr. McDonald holds a J.D. from the University of California College of the Law, San Francisco and an M.B.A. and B.S. from the Haas School of Business, University of California, Berkeley.

29. According to Proxy Statements filed with the SEC, in fiscal years 2025 and 2024, Defendant McDonald received $231,799 and $588,249 respectively in total compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Option Awards ($) | Total Compensation ($) |
|---|---|---|---|
| **2025** | 68,125 | 163,674 | 231,799 |
| **2024** | 69,093 | 519,156 | 588,249 |

30. As of March 1, 2025, Defendant McDonald beneficially owned 258,334 shares of Geron common stock. Based on Geron's stock price of $1.76 per share at the close of trading on February 28, 2025 (the last trading day before that date), McDonald's beneficially owned shares had a market value of approximately $454,667.84. By March 26, 2026, McDonald beneficially owned 685,000 shares of Geron common stock. Based on Geron's stock price of $1.54 per share on that date, McDonald's beneficially owned shares had a market value of approximately $1,054,900.

31. **Defendant Molineaux** has served as a member of the Company's Board since September 2012 and is currently the Chair of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.

32. The Company's 2026 Proxy Statement stated the following about Defendant Molineaux:

> **Susan M. Molineaux, Ph.D.** has served as a director of Geron since September 2012. Dr. Molineaux currently serves as the Executive Chair of Seranova Bio Inc.,

an early-stage private therapeutics company, a position she has held since January 2026. Dr. Molineaux also served as the Chief Executive Officer at Para Therapeutics, Inc., from April 2023 to July 2025 and as a member of the board of directors of Repare Therapeutics Inc., a clinical-stage precision oncology company, from June 2023 to December 2025. Prior to her role at Para Therapeutics, Inc., Dr. Molineaux was Chief Executive Officer, President, and a member of the board of directors of Calithera Biosciences, Inc., since co-founding the company in June 2010 until March 2023. Dr. Molineaux previously served as a member of the boards of directors of Cyteir Therapeutics, Inc., a clinical-stage DNA repair and synthetic lethality company, from December 2020 until May 2023, and Theravance Biopharma, Inc., a biopharmaceutical company, from April 2015 to April 2022. Before she co-founded Calithera Biosciences, Dr. Molineaux co-founded Proteolix, Inc., a privately-held oncology-oriented biopharmaceutical company, where she served as Chief Scientific Officer from December 2003 to December 2005, Chief Executive Officer from January 2006 to January 2009, and again as Chief Scientific Officer from February 2009 until Proteolix's acquisition by Onyx Pharmaceuticals, Inc., a global oncology-oriented biopharmaceutical company, in November 2009. Previously, Dr. Molineaux held several senior management positions in the biopharmaceutical industry, including Vice President of Biology at Rigel Pharmaceuticals, Inc., a biopharmaceutical company focused on inflammatory and autoimmune diseases; Vice President of Biology at Praelux, Inc., a biopharmaceutical company; and Vice President of Drug Development at Praecis Pharmaceuticals, Inc., an oncology-focused biopharmaceutical company. Dr. Molineaux also serves as a Scientific Advisor to Lightstone Ventures, a private life sciences investment company, since September 2016. Dr. Molineaux holds a B.S. in biology from Smith College, a Ph.D. in molecular biology from Johns Hopkins University, and completed a postdoctoral fellowship at Columbia University.

33. According to Proxy Statements filed with the SEC, in fiscal years 2025 and 2024, Defendant Molineaux received $233,674 and $582,471 respectively in total compensation from the Company.

| **Fiscal Year** | **Fees Earned or Paid in Cash ($)** | **Option Awards ($)** | **Total Compensation ($)** |
|---|---|---|---|
| **2025** | 70,000 | 163,674 | 233,674 |
| **2024** | 63,315 | 519,156 | 582,471 |

34. As of March 1, 2025, Defendant Molineaux beneficially owned 726,000 shares of Geron common stock. Based on Geron's stock price of $1.76 per share at the close of trading on February 28, 2025 (the last trading day before that date), Molineaux's beneficially owned shares

had a market value of approximately $1,277,760. By March 26, 2026, Molineaux beneficially owned 1,131,527 shares of Geron common stock. Based on Geron's stock price of $1.54 per share on that date, Molineaux's beneficially owned shares had a market value of approximately $1,742,551.58.

35. Defendant O'Farrell has served as a member of the Company's Board since March 2019 and is currently the Chair of the Company's Board of Directors and Chair of the Audit Committee.

36. The Company's 2026 Proxy Statement stated the following about Defendant O'Farrell:

> **Elizabeth G. O'Farrell** has served as a director of Geron since March 2019 and as Chair of the Board since March 2025 and, prior to that time, as Lead Independent Director since May 2023. Ms. O'Farrell also serves as a member of the boards of directors of LENSAR, Inc., a global medical technology company, since February 2021, Genmab A/S, a global oncology company, since March 2022 and SpyGlass Pharma, Inc., a global ophthalmic therapeutics company, since August 2025. Previously, she served as a member of the board of directors of Inhibikase Therapeutics, a pharmaceutical company focused on treatments of neurological infections and neurodegenerative diseases, from March 2019 to September 2022. Ms. O'Farrell also served as a board member of the YMCA of Greater Indianapolis from 2006 until 2017, including as its chairperson from 2014 to 2016. In December 2017, Ms. O'Farrell retired from a 24-year career with Eli Lilly and Company, a global pharmaceutical company, where she held several senior management positions in finance and corporate governance, most recently serving as Chief Procurement Officer and Head of Global Shared Services from January 2012 to December 2017. Prior to that position, she also served as Senior Vice President, Policy and Finance; Senior Vice President, Finance; Chief Financial Officer, Lilly USA; Chief Financial Officer, Lilly Canada; and General Auditor. Before joining Eli Lilly, Ms. O'Farrell was an accountant with Boise Cascade Office Products, and served as an auditor at Whipple & Company, a professional accountancy firm, and Price Waterhouse, an international public accounting firm. Ms. O'Farrell holds a B.S. in accounting with honors and an M.B.A. in management information systems, both from Indiana University.

37. According to Proxy Statements filed with the SEC, in fiscal years 2025 and 2024, Defendant O'Farrell received $282,410 and $630,749 respectively in total compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash($) | Option Awards($) | Total Compensation($) |
|---|---|---|---|
| **2025** | 118,736 | 163,674 | 282,410 |
| **2024** | 111,593 | 519,156 | 630,749 |

38. As of March 1, 2025, Defendant O'Farrell beneficially owned 639,627 shares of Geron common stock. Based on Geron's stock price of $1.76 per share at the close of trading on February 28, 2025, O'Farrell's beneficially owned shares had a market value of approximately $1,125,743.52. By March 26, 2026, O'Farrell beneficially owned 999,627 shares of Geron common stock. Based on Geron's stock price of $1.54 per share on that date, O'Farrell's beneficially owned shares had a market value of approximately $1,539,425.58.

39. Defendant Spiegel has served as a member of the Company's Board since May 2010 and is currently a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

40. The Company's 2026 Proxy Statement stated the following about Defendant Spiegel:

> **Robert J. Spiegel, M.D., FACP**, has served as a director of Geron since May 2010. Dr. Spiegel currently serves as an Associate Professor at the Weill Cornell Medical School, a Senior Advisor to Warburg Pincus, a private equity firm, and an advisor to the Israel Biotech Fund, a venture investment fund. He is also a member of the boards of directors of Ayala Pharmaceuticals, a clinical-stage oncology company, since December 2017, and RenovoRx, a clinical-stage oncology company, since April 2023. In the last five years, he has previously served as a director for Athenex, a biopharmaceutical company, from August 2020 to September 2023, and Cyclacel Pharmaceuticals, Inc., a biopharmaceutical company developing targeted medicines for cancer and other proliferative diseases, from September 2018 to January 2025. From March 2011 to April 2016, Dr. Spiegel served as Chief Medical Officer of PTC Therapeutics, Inc., a biopharmaceutical company focused on

discovering and developing treatments for rare disorders. In 2009, after 26 years with the Schering-Plough Corporation (now Merck & Co.), a global healthcare company, Dr. Spiegel retired as Chief Medical Officer and Senior Vice President of the Schering-Plough Research Institute, the pharmaceutical research arm of the Schering-Plough Corporation. His career at Schering-Plough involved various positions, including Director of clinical research for oncology, Vice President of clinical research, and Senior Vice President of worldwide clinical research. Following a residency in internal medicine, Dr. Spiegel completed a fellowship in medical oncology at the National Cancer Institute, and from 1981 to 1999 he held academic positions at the National Cancer Institute and New York University Cancer Center. Dr. Spiegel holds a B.A. from Yale University and an M.D. from the University of Pennsylvania.

41. According to Proxy Statements filed with the SEC, in fiscal years 2025 and 2024, Defendant Spiegel received $226,174 and $583,321 respectively in total compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Option Awards ($) | Total Compensation ($) |
|---|---|---|---|
| **2025** | 62,500 | 163,674 | 226,174 |
| **2024** | 64,165 | 519,156 | 583,321 |

42. As of March 1, 2025, Defendant Spiegel beneficially owned 1,038,391 shares of Geron common stock. Based on Geron's stock price of $1.76 per share at the close of trading on February 28, 2025, Spiegel's beneficially owned shares had a market value of approximately $1,827,568.16. By March 26, 2026, Spiegel beneficially owned 1,335,464 shares of Geron common stock. Based on Geron's stock price of $1.54 per share on that date, Spiegel's beneficially owned shares had a market value of approximately $2,056,614.56.

43. Defendant Lawlis served as a member of the Company's Board from March 2012 until May 2026. During some or all of the Relevant Period, Lawlis served as a member of the Audit Committee.

44. According to Proxy Statements filed with the SEC, in fiscal years 2025 and 2024, Defendant Lawlis received $233,232 and $586,656 respectively in total compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Option Awards ($) | Total Compensation ($) |
|---|---|---|---|
| **2025** | 69,558 | 163,674 | 233,232 |
| **2024** | 67,500 | 519,156 | 586,656 |

45. As of March 1, 2025, Defendant Lawlis beneficially owned 761,000 shares of Geron common stock. Based on Geron's stock price of $1.76 per share at the close of trading on February 28, 2025, Lawlis's beneficially owned shares had a market value of approximately $1,339,360. By March 26, 2026, Lawlis beneficially owned 1,049,300 shares of Geron common stock. Based on Geron's stock price of $1.54 per share on that date, Lawlis's beneficially owned shares had a market value of approximately $1,615,922.

46. Defendant Aggarwal served as a member of the Company's Board from November 2023 until October 2025.

47. According to Proxy Statements filed with the SEC, in fiscal years 2025 and 2024, Defendant Aggarwal received $219,612 and $589,843 respectively in total compensation from the Company.

| Fiscal Year | Fees Earned or Paid in Cash ($) | Option Awards ($) | Total Compensation ($) |
|---|---|---|---|
| **2025** | 55,938 | 163,674 | 219,612 |
| **2024** | 70,687 | 519,156 | 589,843 |

48. As of March 1, 2025, Defendant Aggarwal beneficially owned 27,291,959 shares of Geron common stock. Based on Geron's stock price of $1.76 per share at the close of trading

on February 28, 2025, Aggarwal's beneficially owned shares had a market value of approximately $48,033,847.84.[3]

***Officer Defendants***

49. Defendant Scarlett served as the Company's CEO from September 2011 until March 10, 2025, as President from January 2012 until March 10, 2025, and as Chairman of the Board of Directors from December 2018 until March 10, 2025. Scarlett is a named defendant in the Securities Action.

50. According to Proxy Statements filed with the SEC, in fiscal years 2025 and 2024, Defendant Scarlett received $7,422,754 and $6,125,238 respectively in total compensation from the Company.

| Fiscal Year | Salary ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Comp. ($) | All Other Comp. ($) | Total ($) |
|---|---|---|---|---|---|---|
| **2025** | 309,781 | 1,078,300 | 4,308,104 | — | 1,726,569 | 7,422,754 |
| **2024** | 810,600 | — | 4,591,200 | 658,600 | 64,838 | 6,125,238 |

51. As of March 1, 2025, Defendant Scarlett beneficially owned 11,710,250 shares of Geron common stock. Based on Geron's stock price of $1.76 per share at the close of trading on February 28, 2025, Scarlett's beneficially owned shares had a market value of approximately $20,610,040.

52. Defendant Grethlein served as the Company's Executive Vice President ("EVP") and Chief Operating Officer ("COO") from January 2019 until October 2025.

[3] Of those shares, 27,225,292 were held by Vivo Opportunity Fund Holdings, L.P., whose general partner is Vivo Opportunity, LLC, of which Aggarwal is a managing member. Aggarwal acknowledges his beneficial ownership to the extent of his pecuniary interest therein.

53. According to the 2026 and 2025 Proxy Statements, respectively, in fiscal years 2025 and 2024, Defendant Grethlein received $3,316,444 and $2,813,956 respectively in total compensation from the Company.

| **Fiscal Year** | **Salary ($)** | **Stock Awards ($)** | **Option Awards ($)** | **Non-Equity Incentive Plan Comp. ($)** | **All Other Comp. ($)** | **Total ($)** |
|---|---|---|---|---|---|---|
| **2025** | 563,276 | 368,200 | 1,474,253 | — | 910,715 | 3,316,444 |
| **2024** | 600,000 | — | 1,836,480 | 364,500 | 12,976 | 2,813,956 |

54. As of March 1, 2025, Defendant Grethlein beneficially owned 3,698,819 shares of Geron common stock. Based on Geron's stock price of $1.76 per share at the close of trading on February 28, 2025, Grethlein's beneficially owned shares had a market value of approximately $6,509,921.44. By March 26, 2026, Grethlein beneficially owned 4,110,156 shares of Geron common stock. Based on Geron's stock price of $1.54 per share on that date, Grethlein's beneficially owned shares had a market value of approximately $6,329,640.24.

55. During the Relevant Period, and while in possession of material non-public information, Defendant Grethlein sold 674,348 shares of Geron common stock for proceeds of approximately $3,073,004.

56. Defendant Robertson has served as the Company's EVP and Chief Financial Officer ("CFO") since September 2023.

57. According to Proxy Statements filed with the SEC, in fiscal years 2025 and 2024, Defendant Robertson received $2,250,082 and $2,147,216 respectively in total compensation from the Company.

| Fiscal Year | Salary ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Comp. ($) | All Other Comp. ($) | Total ($) |
|---|---|---|---|---|---|---|
| **2025** | 559,800 | 289,300 | 1,150,230 | 239,300 | 11,452 | 2,250,082 |
| **2024** | 540,800 | — | 1,300,840 | 292,000 | 13,576 | 2,147,216 |

58. As of March 1, 2025, Defendant Robertson beneficially owned 940,625 shares of Geron common stock. Based on Geron's stock price of $1.76 per share at the close of trading on February 28, 2025, Robertson's beneficially owned shares had a market value of approximately $1,655,500. By March 26, 2026, Robertson beneficially owned 1,954,520 shares of Geron common stock. Based on Geron's stock price of $1.54 per share on that date, Robertson's beneficially owned shares had a market value of approximately $3,009,960.80.

59. Defendant Feller served as the Company's EVP and Chief Medical Officer ("CMO") from July 2022 until December 2025.

60. During the Relevant Period, and while in possession of material non-public information, Defendant Feller sold 287,900 shares of Geron common stock for proceeds of approximately $1,334,128.

61. Defendant Kapur served as the Company's EVP of Corporate Strategy and Chief Commercial Officer ("CCO") from December 2019 until August 31, 2024.

62. During the Relevant Period, and while in possession of material non-public information, Defendant Kapur sold 421,875 shares of Geron common stock for proceeds of approximately $1,959,609.

63. Defendant Ziegler served as the Company's EVP and CCO from September 2024 until October 2025. Ziegler is a named defendant in the Securities Action.

64. According to Proxy Statements filed with the SEC, in fiscal years 2025 and 2024, Defendant Ziegler received $2,392,709 and $5,768,744 respectively in total compensation from the Company.[4]

| Fiscal Year | Salary ($) | Stock Awards ($) | Option Awards ($) | Non-Equity Incentive Plan Comp. ($) | All Other Comp. ($) | Total ($) |
|---|---|---|---|---|---|---|
| **2025** | 470,028 | 234,070 | 927,549 | — | 761,062 | 2,392,709 |
| **2024** | 163,221 | — | 5,154,400 | 88,300 | 1,044 | 5,768,744 |

65. As of March 1, 2025, Defendant Ziegler beneficially owned 100,000 shares of Geron common stock. Based on Geron's stock price of $1.76 per share at the close of trading on February 28, 2025, Ziegler's beneficially owned shares had a market value of approximately $176,000. By March 26, 2026, Ziegler beneficially owned 610,479 shares of Geron common stock. Based on Geron's stock price of $1.54 per share on that date, Ziegler's beneficially owned shares had a market value of approximately $940,137.66.

66. Defendants Grethlein, Feller, and Kapur are referred to herein as the "Insider Selling Defendants."

**Non-Party Directors**

67. Mr. Harout Semerjian ("Semerjian") has served as President, CEO, and a member of the Company's Board since August 2025.

[4] The 2024 figures are as reported in the Summary Compensation Table of the Company's 2025 Proxy Statement and repeated in the Company's 2026 Proxy Statement. The individual components reported for 2024 (salary of $163,221, option awards of $5,154,400, non-equity incentive plan compensation of $88,300, and all other compensation of $1,044) total $5,406,965, which is $361,779 less than the reported total of $5,768,744. The proxy statements do not explain this difference.

68. Director Patricia Andrews ("Andrews") has served as a member of the Company's Board since March 2026.

69. Director Constantine Chinoporos ("Chinoporos") has served as a member of the Company's Board since March 2026.

70. During the Relevant Period, the Individual Defendants were actively engaged in managing the Company's operations at the highest levels and had access to confidential and proprietary information related to the Company's business, operations, services, markets, competition, sales, demand, backlog, and future business prospects. They also participated in drafting, producing, reviewing, and disseminating the allegedly false and misleading statements detailed herein. Furthermore, they were either aware of or recklessly disregarded the inaccuracies and misrepresentations made about the Company through public statements, representations, and filings and either approved or ratified these statements actively, or through inaction, thereby violating the federal securities laws.

71. As officers and controlling persons of a publicly traded company whose securities are registered with the SEC under the Exchange Act and listed on the Nasdaq, the Individual Defendants had a duty to promptly disclose truthful, accurate, and complete information regarding the Company's business, operations, services, markets, competition, sales, demand, backlog, and current and future business prospects. They were also obligated to correct any prior statements that were materially false or misleading to ensure that the market price of the Company's publicly traded shares reflected truthful, accurate and complete information. The Defendants' false and misleading representations and omissions during the Relevant Period constituted a violation of these specific duties and obligations under federal securities laws.

72. The Individual Defendants, by virtue of their positions of control and authority as officers and directors of the Company, exercised control over the content of the Company's SEC filings, press releases, and other public statements issued during the Relevant Period. Each Individual Defendant received copies of the documents alleged to be false and misleading before or shortly after their publication and had the ability and opportunity to prevent their issuance or ensure their correction. As a result, each Individual Defendant bears responsibility for the accuracy of the public statements described herein and is therefore primarily liable for the representations contained within them.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

73. In committing the wrongful acts alleged herein, the Individual Defendants have engaged in, or aligned themselves with, a common course of conduct, acting in concert and conspiring with one another to further their misconduct. They caused the Company to conceal the true facts as outlined in this complaint. Additionally, the Individual Defendants aided, abetted, and/or assisted each other in breaching their respective duties.

74. The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to enable and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

75. The Individual Defendants carried out their conspiracy, common enterprise, and/or coordinated actions by causing the Company to deliberately, recklessly, or negligently conceal material facts, fail to correct those misrepresentations, and violate applicable laws.

76. To advance this plan, conspiracy, and course of conduct, the Individual Defendants, both collectively and individually, carried out the actions described herein. As these actions were executed under the Board's authority, the Individual Defendants, as directors of Geron, were

direct, essential, and significant participants, collectively and individually, in the conspiracy, joint enterprise, and/or coordinated conduct alleged in this complaint.

77. Each of the Individual Defendants aided, abetted, and provided substantial assistance in the wrongdoings described herein. In providing such assistance, each Individual Defendant acted with actual or constructive knowledge of the primary misconduct, either directly participated in or significantly contributed to the commission of that wrongdoing, and was, or should have been, aware of his or her overall role in furthering the misconduct.

78. At all relevant times, each of the Individual Defendants acted as an agent of the other Defendants and of Geron, and at all times operated within the course and scope of that agency.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

79. By reason of their positions as officers, directors, and/or fiduciaries of Geron, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed Geron and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care.

80. The Individual Defendants were and are required to use their utmost ability to control and manage Geron in a fair, just, honest, and equitable manner.

81. The Individual Defendants were and are required to act in furtherance of the best interests of Geron and its shareholders to benefit all shareholders equitably.

82. Each director and officer of the Company owes Geron and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company.

83. As fiduciaries of Geron, the Individual Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein because of their position and authority.

84. The officers and directors of Geron were and are required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company to discharge their duties.

85. Each Individual Defendant under their position as officers and directors of Geron owed to the Company and its shareholders the highest fiduciary duties of loyalty, good faith, care, and diligence in the management and administration of the affairs of the Company.

86. As Geron's directors and officers, the Individual Defendants knowingly acted with reckless disregard for their obligations as fiduciaries because their conduct posed a significant risk of harm to the Company.

87. The Individual Defendants had a duty to prevent and correct the dissemination of erroneous, misleading, and deceitful information concerning, inter alia, the Company's financial condition, business operations, management, performance, growth, earnings, and business prospects. Moreover, as senior officers of a publicly traded company whose common stock was registered with the SEC, pursuant to the Exchange Act, the Individual Defendants had a duty to act in the best interest of the Company.

88. As fiduciaries, the Individual Defendants had a duty to disclose in the Company's regulatory filings with the SEC all events described in this Complaint that it failed to disclose so that the Company's valuation and the common stock price would be based on accurate information and to preclude deceptive practices in the market.

89. The Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company to discharge their duties. Among other things, the Individual Defendants were required to:

(a) Ensure the Company's affairs were managed efficiently and in a business-like manner to achieve the highest quality performance;

(b) Ensure the Company operated diligently, honestly, and prudently, in full compliance with all applicable federal and state laws, rules, regulations, and contractual obligations, and acted strictly within its legal authority;

(c) Ensure that communications with the public and shareholders were timely, complete, and made with candor; and

(d) Upon notice of issues concerning the Company's business practices or operations, act in good faith to take appropriate measures to correct the misconduct and prevent its recurrence.

90. Each of the Individual Defendants also bore a duty of loyalty to Geron and its shareholders, mandating the prioritization of the Company's and its shareholders' interests above their own in the management of the Company's affairs and prohibiting the use of their position, influence, or insight into the Company's operations for personal gain.

91. During the pertinent times, the Individual Defendants served as agents for each other and for Geron, always operating within the parameters of their agency.

92. The Individual Defendants, through their advisory, executive, managerial, and directorial roles within Geron, were privy to detrimental, confidential information concerning the Company.

**<u>Code of Business Conduct & Ethics</u>**

93. The Individual Defendants, like all employees, directors, and officers of the Company, are required to comply with Geron's Code of Business Conduct and Ethics (the "Code of Conduct"). The Code of Conduct states, in pertinent part, the following:

**<u>Introduction</u>**

**GERON CORPORATION** ("**GERON**", "the Company", "we", "us", "our") is committed to maintaining high standards of business conduct and ethics. This Code of Business Conduct and Ethics (the "**Code**") reflects the business practices and principles of behavior that support this commitment. We expect every employee, officer, and director to read and understand the Code and its application to the performance of his/her/their business responsibilities. References in the Code to employees are intended to cover officers and, as applicable, directors, officers, managers, and other supervisors are expected to develop in employees a sense of commitment to the spirit, as well as the letter, of the Code. Supervisors are also expected to ensure that all agents and contractors conform to Code standards when working for or on behalf of GERON. The compliance environment within each supervisor's assigned area of responsibility will be a significant factor in evaluating the quality of that individual's performance. Nothing in the Code alters the at-will employment policy of GERON.

The Code addresses conduct that is particularly important to proper dealings with the people and entities with which we interact, but reflects only a part of our commitment. From time to time, we may adopt additional policies and procedures with which our employees, officers and directors are expected to comply, if applicable to them. However, it is the responsibility of each employee to apply common sense, together with his/her/their own highest personal ethical standards, in making business decisions where there is no stated guideline in the Code.

GERON'S Employee Handbook also contains policies that provide guidelines for the conduct of employees in specific areas of GERON'S business. These policies are intended to supplement and not supersede the provisions of this Code. All employees are responsible for reviewing, understanding, and abiding by the policies contained in the Employee Handbook as well as those contained in this Code. Both this Code and the policies located in the Employee Handbook may be amended or supplemented from time to time as Geron deems necessary, and all employees will be alerted to any such amendment or supplement.

Action by members of your immediate family, significant others, friends or persons who live in your household (collectively referred to in the Code as "family members") also may potentially result in ethical issues to the extent that they involve GERON business. For example, acceptance of inappropriate gifts by a family member from one of our suppliers could create a conflict of interest and result in a Code violation attributable to you. Consequently, in complying with the Code, you should consider not only your own conduct, but also that of your family members.

**YOU SHOULD NOT HESITATE TO ASK QUESTIONS ABOUT WHETHER ANY CONDUCT MAY VIOLATE THE CODE, VOICE**

**CONCERNS OR CLARIFY GRAY AREAS. SECTION 20 BELOW DETAILS THE COMPLIANCE RESOURCES AVAILABLE TO YOU. IN ADDITION, YOU SHOULD BE ALERT TO POSSIBLE VIOLATIONS OF THE CODE BY OTHERS AND REPORT SUSPECTED VIOLATIONS, WITHOUT FEAR OF ANY FORM OF RETALIATION, AS FURTHER DESCRIBED IN SECTION 20.** Violations of the Code will not be tolerated. Any employee who violates the standards in the Code may be subject to disciplinary action, which, depending on the nature of the violation and the history of the employee, may range from a warning or reprimand up to and including termination of employment and, in appropriate cases, civil legal action or referral for regulatory or criminal prosecution.

This Code has been approved by the Company's Board of Directors (the "Board") and may be amended only by the Board. If you have any questions regarding the Code or possible violations of the Code, please see Section 20 of this Code (i.e., in sum: you may contact your manager, a member of the Company's Executive Management Committee ("EMC), the Compliance Representative, or use the whistleblower hotline to report anonymously, etc.). GERON'S Compliance Representative can be contacted at CorporateCompliance@geron.com.

## 1. Honest & Ethical Conduct

It is the policy of GERON to promote high standards of integrity and ethics by conducting our affairs in an honest and ethical manner. The integrity and reputation of GERON depends on the honesty, fairness and integrity brought to the job by each person associated with us. Unyielding personal integrity is the foundation of corporate integrity. It is GERON's expectation that all of its directors, officers and employees, wherever located and regardless of function, conduct all activities in accordance with high standards of integrity and ethics, and in compliance with the laws, regulations, and written directives in every country, as well as with this Code and all other corporate and governmental policies. This expectation extends to third parties with whom we may contract to conduct activities on our behalf.

## 2. Legal Compliance

***Culture of Compliance: It is Everyone's Responsibility***

Obeying the law, both in letter and in spirit, is the foundation of this Code. Our success depends upon each employee's operating within legal guidelines and cooperating with local, national and international authorities. We expect employees to be familiar with and understand the legal and regulatory requirements applicable to their business units and

areas of responsibility. We hold periodic training sessions to ensure that all employees comply with the relevant laws, rules and regulations associated with their employment. While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others prior to engaging in any conduct that may violate the Code. Therefore, every employee must not only abide by legal requirements but also with requirements in GERON'S policies and other documents. If you have a question related to compliance, it is important that you not hesitate to seek answers from your manager, an EMC member or the Compliance Representative.

Disregard or violation of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject an individual, as well as GERON, to civil and/or criminal penalties. You should be aware that conduct and records, including emails and text messages, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations because compliance is everyone's responsibility. GERON'S management is available to advise and assist employees. Any questions or concerns about compliance should be brought without delay to your manager, an EMC member or the Compliance Representative, as appropriate. See Section 20 later in this Code for more information.

**3. Insider Trading**

Employees who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose except to conduct our business. All non-public information about GERON or about companies with which we do business is considered confidential information. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal. Employees must exercise the utmost care when aware of material inside information, and must comply with GERON'S Insider Trading Compliance Program.

* * *

**9. Maintenance of Corporate Books, Records, Documents and Accounts; Financial Integrity; Public Reporting**

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries to our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries,

whether they relate to financial results or test results, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to customers, suppliers, service providers, creditors, employees and others with whom we do business. As a result, it is important that our documents, books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

- no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

- employees comply with our system of internal controls; and

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the United States Securities and Exchange Commission, or SEC. Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosures are accurate and transparent and that our reports contain all of the information about GERON that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would intentionally cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with our Finance Department, as well as our independent registered public accounting firm and inside and outside legal counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

Any employee who becomes aware of any departure from these standards has a responsibility to report his/her/their knowledge promptly to a supervisor, a member of the EMC, the Compliance Representative, the Audit Committee or one of the other compliance resources described in Section 20. or in accordance with the provisions of GERON'S Whistleblower Policy on Reporting Complaints Regarding Accounting and Auditing Matters, which permits anonymous reporting.

* * *

**12. Protection and Proper Use of Geron Assets**

All employees are expected to protect our assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on our profitability. Our property, such as office supplies, computer equipment, telephones and facilities, are expected to be used only for legitimate business purposes, although incidental personal use may be permitted. You may not use our corporate name, any brand name or trademark owned or associated with GERON or any letterhead stationery for any personal purpose.

You may not, while acting on behalf of GERON or while using our computing or communications equipment, including telephones, mobile devices, or facilities, either:

- access the internal computer system (also known as "hacking") or other resource of another entity without express written authorization from the entity responsible for operating that resource; or

- commit any unlawful or illegal act, including harassment, libel, fraud, sending of unsolicited bulk email (also known as "spam") in

violation of applicable law, trafficking in contraband of any kind or espionage; or

- utilize GERON computing or communications equipment for non-work related purposes, including access to information or websites containing illegal, inappropriate, pornographic or offensive content.

If you receive authorization to access another entity's computer system or other resource, you must make a permanent record of that authorization so that it may be retrieved for future reference, and you may not exceed the scope of that authorization.

Unsolicited bulk email is regulated by law in a number of jurisdictions. If you intend to send unsolicited bulk email to persons outside of GERON, either while acting on our behalf or using our computing or communications equipment or facilities, you should contact your supervisor or the Compliance Representative for approval.

To the fullest extent permitted by law, all data residing on or transmitted through our computing and communications facilities, including email, text messages, word processing documents and data, is the property of GERON and subject to inspection, retention and review by GERON, with or without an employee's or third party's knowledge, consent or approval, in accordance with applicable law. Any misuse or suspected misuse of our assets must be immediately reported to your supervisor or GERON'S Compliance Representative.

* * *

20. **Compliance Standards and Procedures**

***Compliance Resources***

To facilitate compliance with this Code, we have implemented a program of awareness, training and review. We believe that training increases awareness of a wide range of ethical and legal issues in the workplace, such as conflicts of interest, bribery and corruption, insider trading, data privacy, information security, diversity and inclusion and avoiding hostile work environments and puts these topics into relatable situations, reinforcing the message that rules and policies apply to all employees. As such, it is the policy of GERON to provide training to its employees at the onset of employment and periodically thereafter to ensure a "culture of compliance" is maintained by everyone in every department. We have appointed a Compliance Representative to oversee compliance with this Code, and the Compliance Representative is a person to whom you can

address any questions or concerns. The Compliance Representative is responsible for:

- investigating possible violations of this Code or any of GERON internal policies, procedures and practices;
- training new employees on this Code and on policies and procedures related to upholding its standards and obligations;
- conducting annual training sessions to refresh employees' familiarity with this Code and relevant policies and procedures related thereto;
- implementing a periodic internal auditing and monitoring program for corporate compliance;
- distributing copies of this Code annually to each employee with a reminder that each employee is responsible for reading, understanding and complying with this Code;
- updating this Code as needed and alerting employees to any updates, with appropriate approval of the EMC to reflect changes in the law, GERON operations and in recognized best practices, and to reflect GERON experience; and
- otherwise promoting a "culture of compliance" and an atmosphere of responsible and ethical conduct.

* * *

## Corporate Governance Guidelines

94. The Board of Directors of Geron also established the following guidelines for the conduct and operation of the Board.

* * *

### I. INTRODUCTION

The Board of Directors (the "Board") of Geron Corporation ("Geron" or the "Company") has adopted the following principles as the Company's corporate governance guidelines ("Guidelines") to assist the Board in its exercise of its responsibilities and to serve the interests of the Company and its stockholders. These Guidelines, along with the Company's Certificate of Incorporation and Bylaws, the charters of the Board committees and other corporate governance documents, provide the

framework for the governance of the Company and should be interpreted in light of the foregoing and in the context of all applicable laws. These Guidelines reflect the Board's commitment to monitor the effectiveness of policy and decision making at both the Board and the management level, with the objective of enhancing stockholder value over the long term. As the operation of the Board is a dynamic process, with the aid of the Nominating and Corporate Governance Committee, the Board will review these Guidelines periodically and may make changes from time-to-time as the Board may deem appropriate and in the best interests of the Company and its stockholders or as required by applicable laws and regulations. These Guidelines are intended to serve as a flexible framework within which the Board may conduct its business and not as a set of legally binding obligations.

* * *

*Director Responsibilities*

The business and affairs of the Company will be managed by or under the direction of the Board, including through one or more of its committees as set forth in the Bylaws and committee charters. Each director is expected to spend the time and effort necessary to properly discharge his or her responsibilities. These include (as applicable):

1) overseeing the conduct of the Company's business to evaluate whether the business is being properly managed and in conformity with applicable laws and regulations;

2) reviewing and, where appropriate, approving the Company's major financial objectives, plans, strategies and actions;

3) reviewing and approving long-term strategic and business plans and overseeing execution and evaluating results of such plans;

4) reviewing and, where appropriate, approving major changes in, and determinations of other major issues respecting the appropriate auditing and accounting principles and practices to be used in the preparation of the Company's financial statements;

5) reviewing and, where appropriate, approving major changes in, and determinations under, these Guidelines, the Code of Conduct and other Company policies;

6) reviewing and, where appropriate, approving actions to be undertaken by the Company that would result in a material change in the financial structure or control of the Company, the acquisition or disposition of any business(es) or asset(s) material to the Company or the entry of the Company into any major new line of business;

7) nominating directors, reviewing the structure and operation of the Board and overseeing effective corporate governance;

8) reviewing the performance of the Chief Executive Officer and other members of management based on reports from the Compensation Committee;

9) overseeing the assessment of major risks facing the Company and reviewing options for their mitigation;

10) reviewing information provided by the Company's Chief Executive Officer, Chief Financial Officer and Chief Legal Officer (collectively, with other employees included from time to time, the "Disclosure Committee"), regarding all material communications (oral and written) with the United States Food and Drug Administration ("FDA");

11) reviewing annual reports provided by the Disclosure Committee, directly or through the Audit Committee, regarding the effectiveness of the Company's internal control over financial reporting and, if appropriate, the Company's disclosure procedures for drug approval, manufacturing and marketing efforts, and material communications between the Company and regulatory agencies;

12) planning for succession with respect to the position of the Chief Executive Officer and monitoring management's succession planning for other key executive officers;

13) receiving quarterly reports from Company representative(s) sitting on the steering or similar committees created by the Company in connection with any material collaboration and license agreements;

14) periodically meeting with the Company's Chief Legal Officer to receive a report on the status of every whistleblower complaint, if any, received by the Company in the preceding 12-month period; and

15) overseeing management's efforts designed to ensure that the Company's business is conducted with the highest standards of ethical conduct and in conformity with applicable laws and regulations.

*Interaction with Institutional Investors, the Press and Customers*

The Board believes that management speaks for the Company. Each director should refer all inquiries from institutional investors, the press or customers regarding the Company's operations to management. Individual Board members may, from time to time at the request of the management, meet or otherwise communicate with various constituencies that are involved with the Company. If comments from the Board are

appropriate, they should, in most circumstances, come from the Chief Executive Officer in his or her Board capacity or other member of the Board designated by the Board.

* * *

**VII. OVERSIGHT OF RISK MANAGEMENT**

The Board and the Board committees shall have an active role in overseeing management of the Company's risks. The Board shall regularly review information regarding the Company's credit, liquidity and operations, as well as the risks associated with each. The Compensation Committee shall be responsible for overseeing the management of risks relating to the Company's employment policies and executive compensation plans and arrangements. The Audit Committee shall oversee management of financial risks and cybersecurity risks. The Nominating and Corporate Governance Committee shall oversee management of risks associated with the independence of the Board, potential conflicts of interest and risks relating to succession planning for the Board and Chief Executive Officer. While each committee shall be responsible for evaluating certain risks and overseeing the management of such risks, the entire Board is regularly informed through committee reports about such risks.

* * *

**IX. ETHICS AND CONFLICTS OF INTEREST**

The Board is committed to upholding the highest legal and ethical conduct in fulfilling its responsibilities. The Board expects the Company's directors, officers and all other members of its workforce to act ethically at all times and to certify their commitment to the policies and requirements set forth in Geron's Code of Conduct.

If a director becomes involved in activities or interests that conflict or appear to conflict with the interests of the Company and these activities result in an actual or potential conflict of interest, the director is required to disclose such conflict promptly to the Board. The Board will determine an appropriate resolution on a case-by-case basis. All directors will recuse themselves from any discussion or decision affecting their personal, business or professional interests. The Board will resolve any conflict of interest question involving the CEO or the other Section 16 Officers. The CEO will resolve any conflict of interest issue involving employees of the Company other than Section 16 Officers.

* * *

**<u>Audit Committee Charter</u>**

95. In addition to the duties enumerated above, under the Audit Committee Charter in effect during relevant times, Defendants O'Farrell (Chair), Lawlis, and McDonald (the "Audit Committee Defendants") owed specific additional duties to Geron. Specifically, the Audit Committee Charter states:

> This Amended and Restated Audit Committee Charter (the "Charter") was adopted by the Board of Directors (the "Board") of Geron Corporation (the "Company") at a meeting held on September 14, 2023, and defines the purpose, membership, procedures, and duties of the Audit Committee of the Board (the "Committee").
>
> **I. Purpose**
>
> The purpose of the Committee is to oversee the accounting and financial reporting processes of the Company and the audits of the financial statements of the Company. The Committee shall assist the Board in fulfilling its oversight responsibilities relating to: the integrity of the financial statements and other information provided by the Company to any governmental body, regulatory agency or the public; the Company's system of internal controls regarding finance, accounting, financial reporting and public disclosures; the Company's compliance with legal and regulatory requirements and with ethics policies that management and the Board have established; the qualifications, independence, and performance of the Company's independent registered public accounting firm ("independent auditors"); and the Company's accounting and financial reporting processes generally. Consistent with this function, the Committee encourages continuous improvement of the Company's policies, procedures and practices at all levels.
>
> * * *
>
> **IV. Responsibilities and Duties**
>
> In carrying out its responsibilities, the Committee will endeavor to ensure that the corporate accounting and reporting practices of the Company are in accordance with all regulatory requirements and are of the highest quality. While the Committee has the responsibilities and powers set forth in this Charter, it is not the duty of the Committee to plan or conduct audits or to determine that the Company's financial statements are complete and accurate and are in accordance with generally accepted accounting principles. Management is responsible for the preparation, presentation, and integrity of the Company's financial statements and for the appropriateness of the accounting principles and reporting policies that are used by the Company. The independent auditors are responsible for

auditing the Company's annual financial statements and for reviewing the Company's unaudited interim financial statements. Absent actual knowledge to the contrary, each member of the Committee shall be entitled to rely on the integrity of those persons within the Company and of the professionals and experts (including the Company's independent auditors) from which the Committee receives information and, absent actual knowledge to the contrary, the accuracy of the financial and other information provided to the Committee by such persons, professionals or experts.

Further, auditing literature, particularly Public Company Accounting Oversight Board ("PCAOB") AS 4105, "Reviews of Interim Financial Information", defines the term "review" to include a particular set of required procedures to be undertaken by independent auditors. The members of the Committee are not independent auditors, and the term "review" as used in this Charter is not intended to have the meaning set forth in PCAOB AS 4105 and should not be interpreted to suggest that the Committee members can or should follow the procedures required of independent auditors performing reviews of financial statements.

In discharging its oversight role, the Committee is empowered to investigate any matter brought to its attention that is within the scope of the powers and responsibilities delegated to the Committee, with full access to all books, records, facilities, and personnel of the Company and the authority to obtain advice from and engage independent counsel, accounting and other advisers, as it determines necessary to carry out its duties. The Committee shall have the appropriate financial resources and authority to retain any independent counsel, experts or advisors (accounting, financial or otherwise) that the Committee believes to be necessary or appropriate. The Committee may also utilize the services of the Company's in-house legal counsel or other advisors to the Company.

The Company shall provide for appropriate funding, as determined by the Committee, for payment of (i) compensation to any independent auditors engaged for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company, (ii) compensation to any advisors employed by the Committee that it determines are necessary to carry out its duties and (iii) ordinary administrative expenses of the Committee that are necessary or appropriate in carrying out its duties.

The following shall be the principal duties and responsibilities of the Committee. These are set forth as a guide with the understanding that the Committee and/or the Board may supplement them as appropriate from time to time consistent with the Company's Bylaws.

* * *

2. Review of Financial Statements.

The Committee shall:

A. Prior to dissemination to the public: (i) review with the CEO, CFO, and/or CLO the accuracy of the financial statements contained in SEC Forms 10-Q, Forms 10-K and associated press releases issued by the Company; (ii) review and discuss with the CEO, CFO, and/or CLO any material, proposed compliance-related disclosures in the Company's annual and quarterly financial statements; (iii) prior to the issuance of earnings or announcement of guidance, the Committee shall review and approve any such disclosure with the CEO, CFO and/or CLO to ensure that the proposed disclosure has a reasonable basis and that material risks and contingencies are properly disclosed; and (iv) discuss with the CEO, CFO and/or CLO any earnings guidance provided to analysts and rating agencies, and other reports or financial information submitted to any governmental body or the public in connection with such financial information, including any certification, report, opinion, or review rendered by the independent auditors.

B. Review with the CEO, CFO and/or CLO and the independent auditors the financial statements and disclosures under Management's Discussion and Analysis of Financial Condition and Results of Operations to be included in the Company's Forms 10-K or Forms 10-Q prior to filing, including their judgment about the quality and acceptability of the Company's accounting principles, the reasonableness of significant judgments, the clarity of the disclosures, and the degree of aggressiveness or conservatism of the Company's accounting principles and underlying estimates. The Committee shall discuss the results of the annual audit or quarterly review and any other matters required to be communicated to the Committee by the independent auditors under generally accepted auditing standards, including all critical audit matters ("CAMs") proposed by the independent auditor to be included in the independent auditor's annual audit report.

C. Following completion of the annual audit, review separately with management and with the independent auditors any significant difficulties encountered during the audit, including any restrictions experienced by the independent auditors on the scope of their work or access to required information. Among the items that the Committee should consider reviewing with the independent auditors are: (i) any accounting adjustments that were noted or proposed by the independent auditors but were "passed" (as immaterial or otherwise); (ii) any communications between the independent auditors' audit team and their national office with

respect to auditing or accounting issues encountered during the audit; and (iii) any "management" or "internal control" letter issued, or proposed to be issued, by the independent auditors to the Company. The Committee shall obtain assurances from the independent auditors that Section 10A(b) of the Exchange Act has not been implicated.

D. Review any significant disagreement among management, non-management employees and the independent auditors in connection with the preparation of the Company's annual financial statements and any related disclosures.

E. Based on (i) the review and discussion referred to in paragraph 2(B) above, (ii) the disclosure received from the independent auditors regarding its independence and discussions with the independent auditors regarding such independence pursuant to paragraph 1(D)(ii) above, and (iii) the discussions with the independent auditors pursuant to paragraph 1(F) above, determine whether to recommend to the Board that the audited financial statements be included in the Company's Annual Report on Form 10-K for the fiscal year subject to the audit.

F. Prepare a report to be included in the Company's annual proxy statement, as required by SEC regulations.

G. Report the results of the annual audit to the Board. If requested by the Board, invite the independent auditors to attend the full Board meeting to assist in reporting the results of the annual audit or to answer other Board members' questions.

3. Review of Disclosure Matters.

The Committee shall:

A. Monitor the Company's internal control over financial reporting and review any significant changes in its internal controls.

B. Review any material weaknesses or significant deficiencies identified in internal control over financial reporting, as well as any remediation plan to address internal control deficiencies.

4. Establishment and Oversight of Policies, Programs and Procedures.

The Committee shall:

A. Review with the Company's management and the independent auditors the results of their periodic analysis of significant financial

reporting issues and practices, including changes in accounting principles and disclosure practices.

B. Discuss with the independent auditors the regular reports that such auditors are required to make to the Committee regarding (i) the critical policies and practices of the Company, (ii) the alternative treatments of financial information that are within generally accepted accounting principles and that the independent auditors have discussed with management, and (iii) all other material written communications between the independent auditors and management of the Company, such as any management letter, management representation letter, reports on observations and recommendations on internal controls, independent auditors' engagement letter, independent auditors' independence letter, schedule of unadjusted audit differences and a listing of adjustments and reclassifications not recorded, if any.

C. Consider and approve, if appropriate, significant changes to the Company's auditing and accounting principles and practices as suggested by the independent auditors, management, or non-management employees.

D. At an appropriate time after the Committee has approved changes or improvements in financial or accounting practice, review with the independent auditors and management the extent to which such changes or improvements have been implemented.

E. To the extent not already established, establish regular and separate systems of reporting to the Committee by each of management and the independent auditors regarding significant judgments made in the preparation of the Company's financial statements and the view of each as to the appropriateness of such judgments.

F. Review with the independent auditors and management the adequacy and effectiveness of the Company's accounting, financial, disclosure and other controls, both internal and external, of the Company, including the Company's legal and ethical compliance programs, and elicit any recommendations for the improvement of such internal control procedures or particular areas where new or more detailed controls or procedures are desirable, including the adequacy and effectiveness of the Company's information and cyber security policies, the internal controls regarding information security and any significant deficiencies and significant changes in internal controls. Particular emphasis should be given to the adequacy of such internal controls to expose any payments, transactions, or procedures that might be deemed illegal or otherwise improper.

G. Discuss with management the Company's policies and procedures with respect to risk assessment and risk management.

H. Review and discuss with management risks relating to data privacy, technology and information security, including cyber security, and back-up of information systems and the steps the Company has taken to monitor and control such exposures, but the Board shall continue to have overall responsibility for evaluating key business risks faced by the Company.

5. <u>Review of Compliance</u>.

The Committee shall:

A. Establish, review periodically and update as necessary a Code of Conduct (the "Code"), ensure that management has established a system to enforce the Code, and review management's monitoring of the Company's compliance with the Code.

B. Review the adequacy of and management's implementation and monitoring of the Company's internal control over financial reporting to ensure that the Company's financial statements, reports and other financial information disseminated to governmental organizations and the public satisfy legal requirements.

C. Oversee the Company's Insider Trading Compliance Program (the "Program"), including approval of any material updates to the Program, and receive a report, at least once annually, from the Company's General Counsel as the Company's Insider Trading Compliance Officer (the "Compliance Officer") regarding his or her monitoring of the Program. The Committee shall have regular access to the Compliance Officer, including the opportunity to meet with the Compliance Officer outside of the presence of any other senior executives of the Company.

D. Request assurances from management that the Company's foreign subsidiaries and foreign affiliated entities, if any, are in conformity with applicable legal requirements, including disclosure of related party transactions.

E. Review with the Company's General Counsel any legal matters that could have a significant impact on the Company's financial statements.

F. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls, or auditing matters and for the

confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

In addition to the foregoing, the Chair of the Audit Committee will receive reports from an independent, third-party supplier engaged by the Company to provide and monitor a whistle-blower hot line for Company employees and consultants, such as the Nasdaq OMX Whistleblower Hotline. The Chair will ensure that all anonymous whistleblower complaints are provided to the Company's General Counsel and that all complaints are completely and fully investigated by the Company's General Counsel, or a designated senior-level employee, in consultation with the Audit Committee. The Company's General Counsel must report to the entire Board at least annually on the status of every whistleblower complaint, if any, received by the Company in the preceding 12-month period.

G. Discuss with management any correspondence from or with regulators or governmental agencies, any employee complaints or any published reports that raise material issues regarding the Company's financial statements, financial reporting process or accounting policies.

6. <u>General Responsibilities</u>.

The Committee shall:

A. Review and reassess this Charter at least annually and submit any recommended changes to the Board for its consideration.

B. Periodically, meet separately with management and the independent auditors to discuss issues and concerns warranting Committee attention. The Committee shall provide sufficient opportunity for the independent auditors to meet privately with the members of the Committee. The Committee shall review with the independent auditors any audit problems or difficulties and management's response.

C. Review, and provide oversight of, all related party transactions on an ongoing basis as required by Nasdaq Stock Market rules, and all such related party transactions must be approved by the Committee (or ratified by the Committee if approved by another independent committee of the Board).

D. Review on a periodic basis, or as appropriate, any investment policy of the Company and approve any changes to the investment policy.

E. Review, with management, the Company's finance function, including its budget, organization and quality of personnel.

F. Manage and review executive officer and director indemnification and insurance matters, including director and officer insurance, general liability insurance and cybersecurity.

G. The Committee, through its Chair, shall report regularly to, and review with, the Board (i) any material issues that arise with respect to the Committee's performance of the foregoing responsibilities, and (ii) any issues that arise with respect to the quality or integrity of the Company's financial statements, the Company's compliance with legal or regulatory requirements, the performance and independence of the Company's independent auditors, or any other matter the Committee determines is necessary or advisable to report to the Board.

H. Perform an evaluation of the Committee's own performance at least annually to determine whether it is functioning effectively.

I. Perform any other activities consistent with this Charter, the Company's Bylaws, and governing law, as the Committee or the Board deems necessary or appropriate.

* * *

## FACTUAL BACKGROUND

96. Geron is a commercial-stage biopharmaceutical company focused on the development of cancer therapies. The Company's lead product is imetelstat, which is marketed under the brand name Rytelo. Rytelo is a telomerase inhibitor developed for the treatment of hematologic malignancies, including lower-risk myelodysplastic syndromes and myelofibrosis.

97. On June 6, 2024, the Company received approval from the FDA for Rytelo as a treatment for adult patients suffering from transfusion-dependent anemia. The approved patient population consisted of individuals with low- to intermediate-1 risk myelodysplastic syndromes who require four or more units of red blood cell transfusions during an eight-week period and who have not responded to, have lost response to, or are ineligible for ESAs.

98. Four former Geron employees have provided accounts of Rytelo's launch and sales.[5] One was a Key Account Manager at Geron from the second quarter of 2024 through the second quarter of 2025 and was responsible for selling Rytelo and educating prescribers about it. Another worked at Geron from April 2023 to April 2024 as a Medical Science Liaison ("MSL"), reporting to Michael Steidle ("Steidle"), then Executive Director of Medical Affairs. The former MSL was originally hired as a Clinical Educator, a role focused on commercial, post-launch work, but this employee's title was changed to MSL in January 2024, and the employee then focused on pre-launch activities, including speaking with hematologists about MDS before Rytelo was approved.

99. A third was a senior sales and marketing executive who joined Geron before Thanksgiving 2024 and remained there until after the end of the Relevant Period. This executive reported to Defendant Ziegler and was hired to help Geron address flattened sales and restart Rytelo's sales growth. A fourth held a Director position at Geron before, during, and after the Relevant Period, reporting to a Vice President who in turn reported to the Chief Commercial Officer. This sales-tracking employee tracked sales trends using daily demand data that Geron obtained directly from its specialty distributors, the network that physically sells Geron's product.

100. MDS refers to a group of blood disorders that originate in the bone marrow and are marked by ineffective blood-cell production. MDS is generally classified and treated as a blood cancer, and it primarily affects the elderly, with a median age at diagnosis of approximately 70. Higher-risk MDS involves a greater percentage of abnormal blast cells in the bone marrow

[5] These accounts are detailed in the Second Amended Complaint filed in the Securities Action on April 13, 2026. *See*, *e.g*., Second Amended Complaint, ¶¶ 56–101.

(between 10% and 20%), is more severe, and progresses quickly. Lower-risk MDS involves fewer abnormal blast cells (less than 5%), is less severe, and progresses more slowly.

101. Lower-risk MDS frequently presents with mild to moderate cytopenias, which are reductions in one or more types of blood cells, such as red blood cells (anemia), white blood cells (leukopenia), or platelets (thrombocytopenia). Anemia is typically among the most prominent cytopenias, and chronic anemia is the predominant clinical problem for both higher-risk and lower-risk MDS patients. Many anemic patients become dependent on red blood cell transfusions, which carry clinical consequences and reduce quality of life.

102. ESAs, such as erythropoietin ("EPO"), are the standard of care for treating the chronic anemia of lower-risk MDS. ESAs improve anemia in approximately half of patients, but the benefit is temporary, with a median duration of response of about two years. Once ESAs stop working, patients often receive serial blood transfusions, which can damage other organs through iron overload and are associated with poorer overall survival and a higher risk of acute myeloid leukemia. Other available therapies do not provide a durable benefit. Geron has stated that approximately 10% of lower-risk MDS patients are not eligible for ESAs, a subgroup with a very high "unmet need."

103. Lower-risk MDS patients are either ringed sideroblast positive ("RS-positive") or ringed sideroblast negative ("RS-negative"). RS-negative patients account for approximately 75% of lower-risk MDS patients, are especially vulnerable to poor clinical outcomes, and have limited options for treating anemia once they are relapsed or refractory to ESAs. RS-positive patients make up the remaining 25%, and most of those with a high transfusion burden lack effective treatment options.

104. On July 26, 2024, Geron announced that the National Comprehensive Cancer Network ("NCCN") had updated its MDS Guidelines® to include imetelstat as a Category 1 treatment for second-line RS-positive and RS-negative patients, regardless of prior treatment, and as a Category 2A treatment for first-line, ESA-ineligible RS-positive and RS-negative patients.

105. Geron claimed that, in lower-risk MDS, Rytelo provides "meaningful and durable transfusion independence, activity across MDS patient subtypes, and potential disease-modifying activity achievable with imetelstat treatment," which "are differentiators compared to currently approved products as well as investigational drugs currently in clinical development."

106. Rytelo frequently causes side effects, including cytopenias and neutropenia, a condition involving a low count of neutrophils, a type of white blood cell. MDS itself also generally causes anemia. Because of these side effects, physicians must monitor patients weekly during the first two cycles of Rytelo and monthly thereafter to manage any necessary dose modifications.

107. Rytelo is administered as a two-hour intravenous infusion once every four weeks. By contrast, Reblozyl (luspatercept), a competing product approved in 2023 as a first-line treatment for patients with low- to intermediate-risk MDS, requires only a subcutaneous injection every three weeks. As a result, physicians regarded Rytelo's administration and monitoring requirements as more burdensome and did not view Rytelo as a compelling alternative to Reblozyl.

108. Rytelo is Geron's only commercial drug product and accounts for 99.4% of the Company's annual revenue, so Geron's financial viability and growth depend on Rytelo sales. In its Annual Report on Form 10-K for the year ended December 31, 2024 (the "2024 10-K"), Geron acknowledged that Rytelo is "our only product approved for marketing by the FDA, and our ability to generate revenue from product sales and achieve profitability is wholly dependent on our ability

to successfully commercialize Rytelo in the U.S.” The 2024 10-K also stated that “[o]ur near-term prospects are wholly dependent on Rytelo.” Analysts recognized the same dependence: on October 15, 2024, Scotiabank observed that Geron’s “ability to achieve profitability will depend on successful commercialization of Rytelo…”

109. According to Defendants, the low-risk MDS population for which Rytelo is indicated is treated predominantly by community physicians. On June 7, 2024, when Geron announced Rytelo’s FDA approval, Defendant Kapur stated that “70% of the patients are expected to be treated in the community setting with low-risk MDS.” The market therefore expected most Rytelo sales to come from community healthcare providers.

110. Geron describes Rytelo to investors as a “transformational treatment option for [] underserved populations.” Defendants promoted Rytelo as the likely future standard of care for its approved indications and claimed that it would capture market share not only as a third-line therapy but also as a first- and second-line therapy. According to Defendants, “the favorable FDA label and National Comprehensive Cancer Network, or NCCN®, Clinical Practice Guidelines in Oncology, or NCCN Guidelines®, position RYTELO as a potential blockbuster treatment that can compete for significant market segments in lower-risk MDS, including first-line ESA ineligible patients and second-line patients regardless of prior treatment or RS status.”

111. On that basis, Defendants claimed a total addressable market (“TAM”) for imetelstat of $7 billion, consisting of $3.5 billion in relapsed/refractory myelofibrosis and $3.5 billion in lower-risk MDS, premised on imetelstat’s use as a first-, second-, and third-line therapy. Defendants also told investors that “[n]ew patient starts and duration of treatment are the key primary drivers of revenue” in evaluating Rytelo’s performance and growth.

112. Geron's SEC filings acknowledged that a successful launch of its first-ever drug product would require "substantial preparations," which "include, among other things, the development of an in-house marketing and sales force, which will continue to require significant capital expenditures, management resources and time." The Company also recognized the need to "effectively train sales personnel and equip them with compliant and effective materials[.]" Indeed, Geron's filings stated that its "ability to generate revenues from sales of imetelstat in the U.S.…depends on [the Company] being able to establish sales and marketing capabilities and gain acceptance in the marketplace[.]"

113. During Geron's May 2, 2024 earnings call, Defendants likewise acknowledged that "[i]t's also critical that we provide education and support for physicians on the imetelstat safety profile and help them to contextualize and manage cytopenias so they can offer an optimized patient experience and duration of [testing]."

114. In the lead-up to Rytelo's FDA approval, Defendants repeatedly assured the market that Geron was well prepared for a successful launch, with a fully onboarded commercial and medical affairs team, internal systems and processes in place, and a well-trained sales force.

115. According to former employees, however, the launch was chaotic and Geron had no cohesive launch plan. When Rytelo launched in June 2024, Geron had no marketing materials, lacked sufficient sales and medical staff to promote the drug and educate prescribers, had not adequately educated community physicians (Rytelo's primary prescriber base), and had no clear messaging or positioning for Rytelo's use.

116. The former MSL reported that, when hired in April 2023, Geron's medical and commercial teams were seriously at odds over how to launch Rytelo and how to use different

employees' roles. The former MSL's own reassignment from Clinical Educator, a post-launch commercial role, to MSL, a pre-launch role, in January 2024 illustrated the problem.

117. Throughout that tenure, the former MSL observed internal turmoil at Geron, including tension between Denise Meyer ("Meyer"), the Vice President of Medical Affairs, and Defendant Kapur. As the former MSL described it, "Anil wanted us to transition over to commercial at launch, and Denise didn't want that[.]" The former MSL recalled that, in the run-up to the launch, Meyer and Kapur gave "conflicting directives to the medical and commercial teams."

118. The medical team was divided as well. The former MSL described obvious communication problems between Meyer and the former MSL's supervisor, Steidle: Steidle would set one direction for the medical team, Meyer would then change it, and Steidle would have to backpedal once Meyer or Defendant Kapur learned of his instructions and changed the directive. "They weren't on the same page." The former MSL felt "paralyzed by Michael's direction versus Denise's direction."

119. According to the former MSL, because of the tension among senior leaders, communication from executive leadership "was always unclear," and the conflicting instructions caused confusion and problems in the field that "definitely" affected Geron's commercial readiness and the launch of Rytelo. "When leadership isn't on the same page, how can you expect the field to have clear direction?" The confusion persisted well after the former MSL left Geron in April 2024. Although the former MSL was no longer at Geron when Rytelo launched, current employees with whom the former MSL stayed in contact described the launch as a "cluster." Within weeks of the launch, Geron was forced to overhaul its management.

120. Hematologists who treat MDS generally practice in either a community or an academic setting. Community providers are frontline health professionals who work directly within the communities they serve. Academic providers usually practice at academic medical centers or hospitals, tend to focus more on clinical research, are often faculty members or affiliated clinicians at medical schools or teaching hospitals, and frequently work on clinical trials for new drugs.

121. In February 2024, Defendant Kapur stated that low-risk MDS is treated mainly in the community setting and claimed that, in preparing for Rytelo's commercial launch, Geron was having "extensive discussions with both community and academic providers…" However, because Geron was unprepared for launch and failed to educate community physicians or give them clear messaging about how to use Rytelo, revenue came primarily from academic physicians who already knew Rytelo from working on its clinical trials, and very few community physicians were willing to prescribe it.

122. The former Key Account Manager stated that, at launch, Geron did not provide this employee with any marketing materials, such as pamphlets, case studies, or other selling resources. Marketing materials took a substantial amount of time to arrive, and the only material the former Key Account Manager had available was the "Prescribing Information," the FDA-approved document containing Rytelo's clinical information.

123. The former MSL similarly reported that, in conversations with physicians before the launch, awareness of Rytelo among community providers was low. Most of the community physicians the former MSL spoke with had never heard of Rytelo or knew little about it, whereas academic hematologists were more likely to be familiar with the drug.

124. Geron's failure to educate physicians also undermined its strategy of securing the support of key opinion leaders ("KOLs") before launch. As the former MSL explained, "That can influence the hematology community as a whole when you've got a key opinion leader who says, this is a great drug." Not all KOLs endorsed Rytelo, however; the former MSL identified at least one KOL in Houston who chose to use Reblozyl instead. The former sales-tracking employee likewise reported that Geron's field teams observed a lack of KOL support for Rytelo.

125. The former sales executive corroborated these accounts, reporting that Defendant Ziegler told the executive that, as of September 2024, KOLs offered very little support for Rytelo. Ziegler said he learned this through, among other things, Geron's market research and his attendance at a Society of Hematologic Oncology ("SOHO") meeting in Houston, Texas in September 2024, where he assessed Geron's marketing efforts and met the sales team to form his own view of why sales were flattening.

126. According to the former sales executive, a central problem with the launch, and a reason for the flattening sales, was that Geron had no clear message about how Rytelo should be used. Sales personnel did not know what to tell physicians, which in turn left doctors confused. Geron's market research, which the former sales executive reviewed, showed that when sales representatives asked doctors where Rytelo fit, the doctors were confused because of the lack of clear messaging. Physicians understood that they might use Rytelo when no other option remained, but beyond that had no clarity about when or how to prescribe it. The former sales executive personally observed the lack of clear messaging on Geron's website, in the sales team's visual aids, and in the executive's own conversations with physicians. The former sales-tracking employee similarly reported that Geron's field teams found prescribers reluctant to use Rytelo for anything other than third-line treatment.

127. Defendants would later concede, during Geron's February 26, 2025 earnings call, that the lack of clear messaging and resulting lack of physician awareness hurt Rytelo's adoption and sales, particularly as a first- or second-line treatment. This required Geron to "really increase the reach and frequency, our education and awareness and share of voice especially[,] as you point out[,] with the community [physicians]" and to focus on "improving our promotional and sales force effectiveness" to restart sales growth.

128. On that same call, Defendant Ziegler stated that "[n]ew patient starts and duration of treatment are the key primary drivers of revenue" and explained that Defendants track Rytelo's "weekly" and "week-over-week" sales to evaluate its performance and growth.

129. According to the former sales executive, Geron purchased its weekly sales data from IQVIA. IQVIA data, which is part of the National Prescription Audit, is proprietary, can be obtained only by purchase, and reflects physicians' prescribing histories, including the formulations and dosages prescribed. Geron loaded the weekly IQVIA data into a visualization tool such as Microsoft Excel, which the former sales executive, Defendant Ziegler, regional managers, and others used to analyze weekly Rytelo sales at the national, regional, territory, and account (e.g., prescribing physician or medical center) levels.

130. The former sales executive also recalled that Geron received, each month, a representative sample of IQVIA sales data together with Geron's proprietary market research describing the backgrounds of Rytelo patients and the treatments they had received before starting Rytelo. Defendants therefore could see sales broken out by treatment line on a monthly basis.

131. The former sales executive, who reviewed both the weekly and monthly data, stated that it showed that from the launch onward, most patients placed on Rytelo were a bolus of later-line patients who had no other treatment option. The executive explained that academic physicians

were typically the main prescribers for these later-line patients, because patients who have exhausted other options are the ones who see specialists.

132. The former sales executive confirmed that Geron's weekly sales data showed sales beginning to flatten in September 2024 and continuing to flatten into October 2024. That trend prompted Defendant Ziegler to contact the executive in October 2024 about joining Geron to help him figure out how to restart Rytelo's sales growth.

133. When he reached out in October 2024, Defendant Ziegler told the executive that, based on his own review of Geron's weekly sales data, his attendance at medical conferences, and his interviews of physicians and Geron sales representatives, sales and sales growth had flattened because academics were prescribing Rytelo mainly as a last-resort treatment and the drug was not being used in the second line, owing to a lack of clear messaging or positioning. The executive's goal upon joining Geron was therefore to move Rytelo into an earlier treatment paradigm within the label and to change prescribers' perception and positioning of the drug from the top (e.g., KOLs). According to the executive, this was very difficult because Rytelo had initially been positioned and used mainly as a later-line treatment.

134. After joining Geron before Thanksgiving 2024, the former sales executive reviewed Rytelo's weekly sales data from the launch forward to assess the problem independently. Based on that data, Geron's website and materials, and conversations with regional sales managers and physicians, the executive concluded that from June through August 2024, Rytelo sales consisted of a "bolus" of later-line patients. The executive described these as latent demand patients with short life expectancies who had previously been on Reblozyl or other therapies that had stopped working and who switched to Rytelo as a last resort. Once this initial group was exhausted, around the end of August or early September 2024, sales growth flattened because

Geron was not adding new or second-line patients. The executive noted that when such latent demand patients pass away, growth can turn negative, which is what was happening at Geron.

135. Based on the former sales executive's review of the sales data, sales and sales growth remained flat through October, November, and December 2024 and through the end of the Relevant Period. Although the weekly data showed minor fluctuations of plus or minus 5%, overall monthly trends from September 2024 onward reflected flattening, and Geron was not achieving the growth it had hoped for or that a successful new launch should produce, which the executive placed at 10% or more month over month. According to the executive, the reason for the flattening was evident from the data: doctors were not starting new patients on Rytelo, and the drug was not moving into earlier lines of treatment.

136. After the former sales executive arrived, the executive and Defendant Ziegler tried to refocus Rytelo's messaging on second-line, or at least post-first-line, use. The executive stated that, although Defendant Scarlett was not directly involved in revising the message, Scarlett was aware that Geron needed to refocus its messaging toward post-first-line treatment.

137. The former sales-tracking employee, who tracked sales trends using the daily demand data Geron obtained from its specialty distributors, likewise observed that Rytelo sales began flattening around October 2024 and remained flat through the fourth quarter of 2024 and the first quarter of 2025. In October 2024, the former sales-tracking employee attended a quarterly business review meeting with Defendant Ziegler at which Ziegler acknowledged the slowdown in sales growth that the former sales-tracking employee had already observed. According to the former sales-tracking employee, Geron's field teams attributed the flattening to several factors, including a lack of KOL support, an initial bolus, and prescribers' reluctance to use Rytelo for anything other than third-line treatment.

138. The former Key Account Manager corroborated the accounts of the former sales executive and the former sales-tracking employee. In January 2025, the former Key Account Manager attended a Fast Start meeting with Defendant Ziegler, sales personnel from all regions, and other executives, at which Ziegler told the sales force that Rytelo sales had flattened in September and November 2024 and that sales personnel were not meeting expectations. Ziegler announced new sales goals with a heavy emphasis on Rytelo as a second-line therapy. The former sales executive, who also attended, confirmed that Ziegler delivered a tough message: sales were relatively flat, Geron was not seeing growth, and Geron had to change how it marketed and sold Rytelo and how it operated as a commercial organization.

139. The poor launch and flattening sales led Geron to overhaul its management. On July 23, 2024, roughly one month after the commercial launch, Geron abruptly announced that Defendant Kapur would depart as Chief Commercial Officer effective August 31, 2024. On September 9, 2024, Geron announced Defendant Ziegler's appointment as Chief Commercial Officer to "spearhead Geron's global commercial strategy and operations, lead the commercial organization and be responsible for driving growth of Rytelo." The former sales executive learned from Ziegler that Defendant Scarlett brought Ziegler on in September specifically to address the lack of sales growth, and that Ziegler was able to diagnose the problem quickly by, among other things, reviewing weekly sales data and attending the SOHO meeting.

140. In November 2024, Joseph Eid, M.D. joined Geron as Executive Vice President of Research and Development, "responsible for driving innovative medical and scientific strategies that support RYTELO™ commercially and sustain important research and development opportunities for Geron."

141. During the February 26, 2025 earnings call, Defendants ultimately admitted that "we have observed flat revenue trends over the last few months[]" and "that flatness continued into the prior week leading up to this call."

142. According to the former sales executive, the Company reviewed sales data every week. Defendants Scarlett's and Ziegler's own statements during the February 26, 2025 earnings call corroborate this account: they acknowledged reviewing Geron's "weekly" and "week-over-week" sales data. Likewise, during the November 7, 2024 earnings call, Defendant Ziegler reported on Rytelo sales based on "our own internal demand sales data," generated by the "systems and processes to recognize and report revenues" that Defendant Kapur had touted before the launch.

143. Every Monday, the former sales executive held a sales meeting with Defendant Ziegler, the Vice President of Sales, and regional managers to review the prior week's sales. According to the executive, Ziegler, Defendant Scarlett, and the entire executive team received Rytelo's weekly sales data by email, broken down by national, regional, territory, and account sales. Because the data showed where Rytelo was sold (e.g., by territory) and where it was used (academic centers or community physicians), the executive and Ziegler could follow up with specific regional or territory managers to learn which treatment line (e.g., first, second, or third) was using the drug.

144. The former sales-tracking employee likewise stated, based on many conversations with Defendant Ziegler, that Ziegler had access through a dashboard to the daily demand data provided by distributors. Ziegler himself stated that Geron also had access to and used "market sizing reports" and "patient chart audits" to analyze sales data and "estimate our number of new patient starts."

145. Accordingly, through the weekly and monthly sales data, discussions with regional and territory managers, and the daily-updated demand dashboard, Geron's executive leadership, including Defendants Scarlett and Ziegler, knew that sales began flattening in September 2024, after the initial bolus, and remained flat through the end of the Relevant Period. The former sales executive added that, although sales may have been somewhat affected around Thanksgiving and Christmas, seasonality was not the main cause of the flattening, which began in September 2024, well before Thanksgiving.

146. On February 26, 2025, Defendant Ziegler claimed that "based upon the rolling 4- and 8-week, we started to see right, let's call it, around the holidays, Thanksgiving holiday going forward."

## MATERIALLY FALSE AND MISLEADING STATEMENTS

### *The 2023 Form 10-K and Related Statements*

147. On February 28, 2024, the Company filed its annual report on Form 10-K with the SEC for the fiscal year ended December 31, 2023 (the "2023 10-K"), which was signed by Defendants Robertson, Scarlett, Aggarwal, Bir, Lawlis, McDonald, Molineaux, O'Farrell, and Spiegel. The 2023 10-K contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Scarlett and Robertson, stating that ". . . the information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

148. With respect to Geron's plans for Rytelo commercially, the 2023 10-K stated the following, in relevant part:

> ***If imetelstat is approved in lower-risk MDS for marketing by regulatory authorities, we plan to commercialize imetelstat ourselves in the U.S***. Our U.S. ***launch strategy is designed to prepare imetelstat, the market and the company to ensure broad reimbursement and deliver a seamless customer experience to all***

> ***stakeholders at launch**. **Several long-lead time activities have already been completed, such as securing a global trademark for the imetelstat brand name; finalizing third party logistics, our distribution network, and our patient support providers; and onboarding highly experienced commercial and medical affairs leadership teams**. **We continue to conduct pre-commercial preparations for the U.S., such as enhancing and/or establishing company processes and systems to support a potential commercial launch**, **refining our market research in lower-risk MDS, engaging in marketing and commercial access/reimbursement preparatory efforts, and hiring our sales force**,*[6] which we expect to occur in the first and second quarters of 2024. ***We continue to evaluate our strategy for the potential launch and commercialization of imetelstat in Europe***. Based on our internal estimates of pricing and addressable patient populations in 2031 and if regulatory authorities approve imetelstat for marketing in lower-risk MDS and relapsed/refractory MF, we believe the potential combined total addressable market opportunity in the U.S. and Europe for imetelstat is approximately $7.0 billion, of which lower-risk MDS represents approximately $3.5 billion and relapsed/refractory MF represents approximately $3.5 billion.

149. The same day, the Company issued a press release announcing its fourth quarter and full year 2023 financial results. In relevant part, the press release stated:

> "Geron's progress and execution throughout 2023 has paved the way for a potentially transformational 2024, as we plan for the transition to becoming a commercial company," said [Defendant] Scarlett[.] "***We believe that we are in a strong position for value creation, based on our differentiated product candidate**, **the potential for significant commercial opportunities in transfusion-dependent, lower-risk MDS and relapsed/refractory MF, the excellence and experience of our employees, and the strength of our balance sheet to support a potential U.S. launch***."

150. Also on February 28, 2024, the Company held an earnings call to discuss its fourth quarter and full year 2023 results (the "4Q23 Earnings Call"). During the 4Q23 Earnings Call, Defendant Scarlett stated, in relevant part:

> [W]e ended 2023 with a strong cash position of approximately $378 million, which based on our current plans and expected available resources, we expect will enable us to fund a potential successful launch in transfusion dependent low risk MDS in the US and fund our planned operations into the third quarter of 2025.
>
> ***We believe our differentiated product candidates, the very important commercial opportunities in transfusion dependent low risk MDS and relapse/refractory MF**, **the excellence and experience of our employees, and the financial resources to***

---

[6] All emphasis is added unless otherwise indicated.

> ***execute on our near-term milestones, puts us in a strong position for value creation***.

151. During the 4Q23 Earnings Call, Defendant Kapur stated, in relevant part:

> Approximately 10% of lower risk MDS patients are not eligible for ESAs and represent a very high unmet need subgroup. RS-negative patients make up approximately 75% of lower risk MDS patients and are a population particularly vulnerable to poor clinical outcomes. There are no therapies indicated for the treatment of anemia in RS negative patients once they are relapsed or refractory to ESAs. RS positive patients make up approximately 25% of the lower-risk MDS patients, and most who are high-transfusion burden lack effective treatment options. These underserved subgroups are at a greater risk for disease progression and suboptimal survival and are in the need for more effective treatment options.
>
> Moving on to an update on US launch preparations, with our PDUFA date just about 3.5 months away, we have completed multiple critical launch readiness activities and plan to be ready to launch imetelstat in the US market upon potential approval. Long lead time activities such as securing our global trademark on our brand name, manufacturing of commercial supply are now complete. In preparation of launch, we have also finalized our distribution network and our patient support providers. In addition, we have onboarded and fully integrated a highly experienced commercial and medical affairs team into Geron. We continue to transition Geron towards a commercial company with the integration and adoption of systems and processes to recognize and report revenues and the continued refinement of engagement plans with marketing, commercial access, payer and reimbursement stakeholders.

152. On March 14, 2024, Geron issued a press release concerning the FDA Oncologic Drugs Advisory Committee's favorable vote on the benefit/risk profile of imetelstat (later marketed as Rytelo). In the press release, which was titled "Geron Announces FDA Oncologic Drugs Advisory Committee Votes in Favor of the Clinical Benefit/Risk Profile of Imetelstat for the Treatment of Transfusion-Dependent Anemia in Patients with Lower-Risk MDS," the Company stated the following, in relevant part:

> "***We are pleased with the Committee's decision to recognize the positive clinical benefit/risk profile of imetelstat for the treatment of transfusion-dependent anemia in adult patients with lower-risk MDS***. There are few treatment options and significant unmet medical need remains for these patients, particularly among those with difficult-to-treat subtypes of this blood cancer," said [Defendant] Feller[.] "***We believe that imetelstat has the potential to be an important new***

> ***medicine for patients*** and look forward to continuing our collaboration with the FDA as they complete their review of our New Drug Application."

153. The statements identified above in connection with the 2023 10-K, the February 28, 2024 press release and 4Q23 Earnings Call, and the March 14, 2024 press release were materially false and misleading and failed to disclose material adverse information required to make those statements not misleading. Among other things, Defendants did not reveal that: (i) Geron was not prepared for Rytelo's commercial launch, as it had no cohesive launch plan, no marketing materials, insufficient sales and medical staff, and no clear messaging about where Rytelo fit in treatment; (ii) Geron had not adequately educated the community physicians who were expected to be Rytelo's primary prescribers; (iii) Rytelo's launch would be hindered by its weekly monitoring requirement, existing competition, and a general lack of awareness of the treatment in the health care community; and (iv) as a consequence of the foregoing, Rytelo's launch would be less successful, and the Company would experience less growth, than Defendants represented, and the Individual Defendants' favorable representations regarding the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis.

***The 2024 Proxy Statement***

154. On March 27, 2024, the Company filed its Proxy Statement with the SEC on Schedule 14A (the "2024 Proxy"). Defendants Scarlett, McDonald, Spiegel, Aggarwal, Bir, O'Farrell, Lawlis, and Molineaux solicited the 2024 Proxy, filed pursuant to Section 14(a) of the Exchange Act, which contained materially false and misleading statements.

155. The 2024 Proxy called for shareholders to vote to, inter alia: (1) re-elect Defendants Scarlett, McDonald, and Spiegel to the Board; (2) approve, on an advisory, non-binding basis, named executive officer compensation; and (3) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for 2024.

156. Regarding the "Board's Role in Risk Oversight," the 2024 Proxy stated the following, in relevant part:

> We are subject to a variety of risks, including those described under the section entitled "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2023. Some risks may be readily perceived and even quantified, while others are unexpected or unforeseeable. Risks can be external or can arise as a result of our internal business or financial activities. Our Board, as a whole, is responsible for broad oversight of all existing and emerging enterprise risk (over the short-, mid- and long-term) and of management's development and execution of mitigation strategies designed to address those risks. In this capacity, our Board has designated committees to assist in its oversight of particular key risks as described below. Oversight of additional matters of potential risk not delegated remain the responsibility of the full Board.
>
> While the Board and its committees oversee risk management, our senior management is responsible for identifying, assessing and mitigating risk on a day-to-day basis. Each committee of our Board meets regularly with key management personnel and, as desired by the applicable committee, outside advisors (including outside counsel, consultants and experts) to oversee risks associated with their respective principal areas of focus. In turn, each committee reports to the Board regularly, fostering awareness and communication of significant matters among all directors, and promoting a coordinated and cohesive approach to enterprise risk oversight. It is management's responsibility to identify various risks facing the Company, bring the Board's attention to material risks, and implement appropriate risk management policies and procedures to manage risk exposure on a day-to-day basis.

157. Regarding the Code of Conduct, the 2024 Proxy stated:

> We believe our Code of Conduct reflects current industry and public company best practices, and it sets forth guiding principles and policies related to (i) compliance with health care laws and regulations, (ii) product quality, pharmacovigilance and regulatory compliance, and (iii) privacy and information security policies. Our Code of Conduct is available in its entirety on the Corporate Governance page in the Investors & Media section of our website at www.geron.com and to any stockholder otherwise requesting a copy. All our directors, employees and members of our executive management team, including our Chief Executive Officer and Chief Financial Officer, are required to adhere to the Code of Conduct in discharging their work-related responsibilities. Employees are required to report any conduct they believe in good faith to be an actual or apparent violation of the Code of Conduct. Amendments to the Code of Conduct, and any waivers from the Code of Conduct granted to our directors or members of our executive management team, will be made available through our website as they are adopted. Accordingly, we intend to satisfy the disclosure requirement under Item 5.05 of Form 8-K

> regarding an amendment to, or waiver from, a provision of the Code of Conduct by posting such information on our website at www.geron.com.

158. The 2024 Proxy was materially false and misleading because it assured shareholders that the Board and its committees were actively overseeing the Company's risks and that the Company's directors and officers adhered to the Code of Conduct. To the contrary, the 2024 Proxy failed to disclose that: (i) the Board and its committees were not adequately exercising their risk oversight functions and were causing or permitting the Company to issue the false and misleading statements alleged herein; (ii) the Individual Defendants were violating the Code of Conduct, either without waivers or without such waivers being disclosed; and (iii) for the reasons set forth above, Geron was not prepared for a successful commercial launch of Rytelo, and the Company's statements about its business, operations, and prospects were materially false and misleading and lacked a reasonable basis.

159. As a result of Defendants Scarlett, McDonald, Spiegel, Aggarwal, Bir, O'Farrell, Lawlis, and Molineaux causing the 2024 Proxy to be false and misleading, at the May 9, 2024 annual meeting, Company shareholders voted, inter alia, to: (1) re-elect Defendants Scarlett, McDonald, and Spiegel to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve named executive officer compensation on an advisory basis; and (3) ratify the appointment of Ernst & Young LLP as the Company's independent registered public accounting firm for 2024.

***May Through September 2024 Statements***

160. On May 2, 2024, the Company issued a press release concerning its financial results for the first quarter of 2024. In relevant part, the press release stated:

> "Since the FDA ODAC's 12 to 2 vote in favor of the clinical benefit/risk profile of imetelstat for the treatment of transfusion-dependent anemia in patients with lower-risk MDS in March, we have continued working with the FDA as they complete their review of our New Drug Application, which has a June 16, 2024 PDUFA

> target action date," said [Defendant] Scarlett[.] "We ***are actively preparing for a successful launch of imetelstat in the U.S., if approved, including most recently onboarding our sales force last month***, ***refining our market research and completing buildout of our enterprise capabilities and systems to support our transition from a clinical to commercial-stage company***." . . . Geron has now completed onboarding its commercial team, with the buildout of the full sales organization in April. ***Other commercial preparations for the U.S. are ongoing and on target***, ***including enhancing and/or establishing company processes and systems to support an expected commercial launch, refining market research in TD LR-MDS, and engaging in marketing, commercial access, payer, and reimbursement preparatory efforts***.

161. Also on May 2, 2024, the Company hosted an earnings call to discuss its financial results for the first quarter of 2024 (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Scarlett stated, in relevant part:

> We're poised for a successful U.S. launch of Imetelstat for the treatment of transfusion-dependent anemia in patients with lower risk MDS. If approved we're deeply excited for the opportunity to bring patients what we believe is an important and differentiated medicine. With our PDUFA date on June 16th, we continue to work closely with the FDA as they complete the review of our new drug application.
>
> * * *
>
> In short, we're building on our momentum acting with urgency and fully confident in our readiness for U.S. launch on potential approval. We're also financially well-resourced to support the planned U.S. commercial launch with approximately $465 million on the balance sheet as of March 31 of this year. On the heels of the highly positive ODAC outcome, we raised approximately $141 million in net proceeds from an underwritten public offering of common stock and a pre-funded warranty.

162. During the 1Q24 Earnings Call, Defendant Kapur stated, in relevant part:

> ***We believe that we are positioned very well for commercial value creation and are well-prepared to execute a successful U.S. launch upon potential approval***. As [Defendant Scarlett] mentioned in April, we completed the build-out of our full commercial organization with the hiring of our sales force, which is being now integrated and trained so that they will be prepared to be deployed in the field upon potential approval.
>
> * * *
>
> ***To support our launch preparation and commercial strategy, we have collected extensive market insights which suggest that Imetelstat is highly differentiated in***

> ***this transfusion-dependent low-risk MDS market*. *Our research has shown that medical and payer stakeholders are dissatisfied with available options in the low-risk MDS space which we believe creates an opportunity for Imetelstat*.**
>
> * * *
>
> We expect to see Imetelstat uptake across ESA ineligible, ESA failed, RS negative, and RS positive high transfusion burden patients. Based on our latest 2024 market research of 50 U.S.-based practicing hematologists across both community and academic settings, on the left-hand side of the slide, you can see that our market research suggests meaningful Imetelstat use in frontline ESA ineligible patients, especially those who are RS negative.
>
> * * *
>
> ***We believe we are well-positioned to capitalize on Imetelstat opportunity in transfusion-dependent low-risk MDS by building on the unique product profile and executing on the launch critical success factors that are driving our commercial plan***. From a prescriber's perspective, we have a few important goals that prescribers embrace the totality of clinical benefit achievable with Imetelstat and understand the efficacy profiles across MDS subgroups, including RS negative and high-transfusion burden patients.

163. On June 6, 2024, the Company published a press release titled "Geron Announces FDA Approval of RYTELO (imetelstat), a First-in-Class Telomerase Inhibitor, for the Treatment of Adult Patients with Lower-Risk MDS with Transfusion-Dependent Anemia." In relevant part, the press release stated:

> "***With the approval and availability of RYTELO, we believe eligible patients with lower-risk MDS can potentially experience meaningful clinical benefit***, ***particularly the potential for greater than 24 weeks of freedom from the burden of red blood cell transfusions and symptomatic anemia***," said [Defendant] Scarlett[.] "***The approval of RYTELO as the first telomerase inhibitor is a testament to the power of our science and the passion of our people to innovate in the field of blood cancer***. As we celebrate today's momentous milestone, I would like to thank the patients and families, advocates, clinicians, study coordinators and site personnel, scientists, and Geron employees and collaborators past and present whose participation was integral to this achievement and to supporting our transformation into a commercial company."
>
> * * *
>
> IMPORTANT SAFETY INFORMATION WARNINGS AND PRECAUTIONS
>
> Thrombocytopenia

> RYTELO can cause thrombocytopenia based on laboratory values. In the clinical trial, new or worsening Grade 3 or 4 decreased platelets occurred in 65% of patients with MDS treated with RYTELO. Monitor patients with thrombocytopenia for bleeding. ***Monitor complete blood cell counts prior to initiation of RYTELO, weekly for the first two cycles, prior to each cycle thereafter, and as clinically indicated***. Administer platelet transfusions as appropriate. Delay the next cycle and resume at the same or reduced dose, or discontinue as recommended.
>
> Neutropenia
>
> RYTELO can cause neutropenia based on laboratory values. In the clinical trial, new or worsening Grade 3 or 4 decreased neutrophils occurred in 72% of patients with MDS treated with RYTELO. Monitor patients with Grade 3 or 4 neutropenia for infections, including sepsis. ***Monitor complete blood cell counts prior to initiation of RYTELO, weekly for the first two cycles, prior to each cycle thereafter, and as clinically indicated***. Administer growth factors and anti-infective therapies for treatment or prophylaxis as appropriate. Delay the next cycle and resume at the same or reduced dose, or discontinue as recommended.

164. On June 7, 2024, the Company hosted a special investor call concerning the FDA's approval of Rytelo. During the call, Defendant Feller described the weekly monitoring requirement of the treatment as "standard." Further, Defendant Kapur stated that the weekly monitoring requirement was not considered a burden by either the academic or medical communities.

165. During the call, Defendant Scarlett made comments regarding Rytelo's recent FDA approval, stating, in relevant part:

> RYTELO is now the first and only FDA-approved telomerase inhibitor.
>
> * * *
>
> The approval of RYTELO, with lower-risk MDS, with transfusion-dependent anemia, broadly across ESA ineligible and ESA relapse and refractory subpopulations, regardless of ring sideroblast or RS status, has the potential to transform the treatment paradigm for these patients who remain in high unmet need despite currently available treatment options. Approximately 10% of lower-risk MDS patients are not eligible for ESAs and have very limited treatment options. RS-positive patients make up approximately 25% of lower-risk MDS patients, and we must continue to experience high transfusion burden despite available therapies. ***RS-negative patients make up approximately 75% of lower-risk MDS patients in our population particularly vulnerable to poor clinical outcomes***. ***There are approximately 13,200 U.S. patients with lower-risk MDS who need treatment for symptomatic anemia***. We believe that RYTELO can become part of the standard

of care and help address unmet need in lower-risk MDS patients with transfusion-dependent anemia who are ESA ineligible, ESA relapsed/refractory RS-negative and ESA relapsed/refractory RS-positive with high transfusion burden.

166. During the call, Defendant Kapur made comments regarding Rytelo's market opportunity, stating, in relevant part:

> ***On this next slide, we believe RYTELO offers a compelling value proposition for stakeholders***. Lower-risk MDS is a blood cancer that often progresses to require increasingly intensified management of key symptoms such as anemia and resulting fatigue. Many lower-risk MDS patients with symptomatic anemia frequently become red blood cell transfusion dependent, which has been shown to be associated with short- and long-term clinical consequences that reduce quality of life and survival. ***There is a high unmet treatment need for patients with lower-risk MDS as many progress and are not responding to current treatments***, ***achieving a durable response or experiencing extended and continuous red blood cell transfusion independence***.
>
> * * *
>
> From our perspective, these guidelines reflect a lack of effective new treatment options, in particular, for those patients who are ESA ineligible high-transfusion burden patients and for RS negative lower-risk MDS patients who constitute an estimated 75% of this market. This is a need, we believe, RYTELO can powerfully address as a potential, durable treatment that can be used broadly across these MDS subtypes. We expect to see RYTELO uptake across ESA ineligible, ESA failed RS-negative and RS-positive high transfusion burden patients. Based on our latest market research, which was completed earlier this month, with 37 community and 20 academic U.S.-based practicing hematologist.
>
> On the left-hand side of this slide, as you can see, our research suggests meaningful RYTELO use in frontline ESA-ineligible patients. The right-hand side of the slide shows the estimated second-line population, approximately 85% of which are expected to be ESA or luspatercept experience. Our ***research suggests a broad use of RYTELO across the second line regardless of frontline therapy and particularly for RS-negative patients***. ***Our research supports the significant unmet treatment needs for the low-risk MDS patient population, and we strongly believe that RYTELO can play a meaningful role for eligible low-risk MDS patients moving forward***.
>
> ***We plan to conduct a prioritized and targeted launch to a concentrated prescriber base of approximately 8,000 health care professionals***. ***We also plan to cover approximately 2,200 targeted accounts and 70% of the patients are expected to be treated in the community setting with low-risk MDS***. As an infused product, RYTELO will be provider administered. Medicare is expected to be the

predominant payer with approximately 84% of the patients falling under the Medicare umbrella.

167. Later during the call, Defendants answered multiple questions concerning Rytelo's launch in the following conversations:

> [Tara A. Bancroft – TD Cowen]: Congrats on the approval and the great label. Can you describe more about your expectations for the cadence of the launch? Like what are the lowest hanging fruits to address first? And will there be a bolus of initial patients, things like that?
>
> [Defendant Scarlett]: Anil?
>
> [Defendant Kapur]: Thank you for the question, Tara. I think boluses are hard, Tara, to define and quantify. What I will say is, what's become very clear is we are launching in a sensitized market and this market is dissatisfied with current options. As you say, the patients who are probably at the highest requirement for new therapies include patients who are either RS-negative, which is a large patient population, patients who are high transfusion burden and patients who may have seen both ESAs and/or luspatercept and are looking for better treatment options. And I think we are going to see a mix of all of these patients. But in general, the unmet need within this market is very high, and RYTELO has differentiated data to address all of the subpopulations.
>
> * * *
>
> [Craig for Corrine Johnson – Goldman Sachs – Analyst]: . . . So to start us off here, the label indicates that the drug is indicated for patients who require 4 or more transfusions in 8 weeks. So what portion of the patients does this apply to?
>
> [Defendant Scarlett]: Go ahead, Anil.
>
> [Defendant Kapur]: Great question, Craig. So Craig, just to step back for a second. I just want to note again that low-risk MDS is a progressive disease and transfusion burden, as we have seen through all the clinical publications and real-world data, only continues to increase over time and continues to increase from one therapy to another. Our research and also data that was published by Dr. Rami at ASH 2023 showed from the real-world data set, approximately 50% of the patients are high transfusion burdens, which are 4 or more. In addition, our research also indicates that transfusion burden, in the eyes of a physician, is a sliding scale, with many physicians, approximately 80% plus of the physicians we have gone to research with indicating even one or higher on a regular basis is not satisfactory to them. So we expect a vast majority of the patients who are transfusion burden to be provided access to RYTELO. In addition, the NCCN guidelines will help with our adoption as well. So I'll just stop here to see if I answered your question.
>
> * * *

> [Kalpit R. Patel – B. Riley Securities, Inc.]: Many congrats on the approval yesterday. As you sort of model out the launch for imetelstat, what are your expectations for the real world average number of cycles, considering that there are more RS-negative patients in the real world than in the clinical trial settings?
>
> [Defendant Kapur]: So Kalpit, we have not provided that guidance. Our expectation is that duration of treatment across both RS-positive and RS-negative and for all the populations we spoke about is likely to be guided by the totality of clinical evidence and how the patient -- as we said, across the factors, which include achievement of transfusion independence, but also the clinical characteristics that we speak about that physicians monitor for patients, including what they are seeing for hemoglobin rises and how the patient is feeling and decreases in RBC transfusions. So we will look at RYTELO, we expect RYTELO to behave in a similar way as well within this marketplace and provide more information when appropriate.
>
> [Kalpit R. Patel – B. Riley Securities, Inc.]: Okay. And one more question maybe. Any thoughts on the weekly monitoring requirements for the first 2 cycles and every cycle thereafter? How similar or dissimilar is that from your clinical trial protocol? And does that weekly monitoring impact a particular group of physicians, maybe community doctors? All I'm trying to ask is how reasonable is it to do this for those types of doctors?
>
> [Defendant Kapur]: Faye, do you want to go for it and I can add?
>
> [Defendant Feller]: Yes. Yes. I can take that. Hi Kal. So it is consistent with what was done on the Phase III IMerge study weekly for the first 2 cycles and then monthly prior to dosing in order to manage any potential dose modifications. This is pretty standard across 4 hematologists, I would say, as closer monitoring, especially in this patient population, it's often merited regardless of what drug you're starting in the beginning of treatment as a patient adjusts to the new treatment and the side effect profile, while monthly before the infusions is pretty standard. I don't know, Anil, if you have anything to add.
>
> [Defendant Kapur]: The only other thing I'll add is, Kalpit, to your question. We also obviously shared our profile and the weekly monitoring is also consistent. Many of these patients, as you know, are highly transfusion burden and they are coming to the clinics once a week or at least more than once a month many, many times to get red blood cell transfusion. So this has not been something that has been highlighted as a burden by both community and the academic facilities.

168. On July 23, 2024, the Company issued a press release concerning Defendant Kapur. The release stated ". . . that Anil Kapur, Executive Vice President, Corporate Strategy and Chief Commercial Officer, will depart the Company on August 31, 2024, to pursue other interests."

169. Also on July 23, 2024, Defendant Scarlett commented on the July 23, 2024 press release, stating:

> We are encouraged by the uptake of RYTELO™ we are seeing in the first month of launch and by the positive feedback from customers and are confident that our seasoned commercial leadership team will continue to drive this momentum going forward . . . We thank Anil for his significant contributions to our business over the past five years, particularly his strategic vision to define the potential market for RYTELO, his articulation of its value proposition and his foundational leadership in building strong commercial organization, which I believe has positioned Geron for long-term success. We wish him the best in his future endeavors.

170. On August 8, 2024, the Company published a press release to announce its financial results for the second quarter of 2024. The press release stated, in relevant part:

> "We are thrilled to have begun the launch of RYTELO, our first commercial product, in June, and are encouraged by the early success we are seeing and the reception from the medical community over these first six weeks," said [Defendant] Scarlett[.] "Our field teams have mobilized efficiently and have already interacted with approximately 60% of our top decile 1-4 accounts across the community and academic settings. This has contributed to gratifying uptake – as of July 31, 2024, we estimate that approximately 160 patients have received RYTELO, which is encouraging given the very early stage of this launch. Further, the MDS NCCN Guidelines, which guide clinical decision-making, prescriber behavior and reimbursement decisions, were updated at the end of July to include RYTELO as a Category 1 and 2A treatment of symptomatic anemia in patients with lower-risk MDS. With the introduction of RYTELO as a new therapeutic option, we are seeing increasing dialogue among hematologists rethinking treatment approaches for eligible patients with lower-risk MDS with transfusion-dependent anemia, regardless of ring sideroblast status, and we believe that RYTELO can become part of the standard-of-care for these patients."

171. That same day, the Company held an earnings call to discuss its financial results for the second quarter of 2024 (the "2Q24 Earnings Call"). During the 2Q24 Earnings Call, Defendant Scarlett stated, in relevant part:

> ***With our strong commercial infrastructure in place at launch and the efficient mobilization of our field teams, we've seen encouraging early launch results*. *As of July 31, 60% of the top decile 1-4 accounts had been reached by our team across both community and academic settings*. *This has led to gratifying uptake*. *We estimate, again, as of July 31, that approximately 160 patients have received RYTELO, which is quite encouraging given the very early stage of this launch***. The enthusiastic reception for RYTELO that we've seen within the hematology

community reinforces the unmet needs for lower-risk MDS patients with symptomatic transfusion-dependent anemia. Many of our customers are passionate about getting access to RYTELO for their patients, and we've seen a strong push across the U.S. to add RYTELO to formularies, treatment pathways, and EMRs, including in the community setting.

172. Defendant Scarlett further stated, in relevant part:

It was just 8 weeks ago that FDA approved RYTELO, our branded name for imetelstat as the first and only telomerase. And it was just 6 weeks ago that RYTELO became commercially available in the U.S. With our strong commercial infrastructure in place at launch and the efficient mobilization of our field teams, we've seen encouraging early launch results. As of July 31, 60% of the top decile 1 to 4 accounts have been reached by our team across both community and academic settings. ***This has led to gratifying uptake***. We estimate again as of July 31 that approximately 160 patients have received RYTELO, which is quite encouraging given the very early stage of this launch. The enthusiastic reception for RYTELO that we've seen within the hematology community reinforces the unmet needs for lower-risk MDS patients with symptomatic transfusion-dependent anemia. Many of our customers are passionate about getting access to RYTELO for their patients, and we've seen a strong push across the U.S. to add RYTELO to formularies, treatment pathways and EMRs, including in the community setting. In addition, the MDS NCCN guidelines were updated this July 25 to include RYTELO as a category 1 and 2A treatment for lower-risk MDS patients. That is, RYTELO is now designated for use in both RS positive and RS negative first-line ESA ineligible patients as well as in both RS positive and RS negative secondline patients regardless of prior first-line treatment. We believe that these favorable NCCN guidelines have put RYTELO in a strong competitive position.

* * *

With the introduction of RYTELO as a new therapeutic option, we're seeing increasing dialogue among hematologists, rethinking treatment approaches for eligible low-risk MDS patients with transfusion dependent anemia. Consequently, we believe that RYTELO can become part of the standard of care for both eligible first and second-line patients. As shown on this slide, from the approximately 13,200 U.S. patients with lower-risk MDS who need treatment for symptomatic anemia, approximately 1 in 10 are ESA ineligible due to serum EPO levels higher than 500 mU/mL. These first-line patients have limited treatment options. RS-positive patients make up approximately 25% of the lower-risk MDS patient population, many of whom continue to experience high transfusion burden despite available therapies. RS-negative patients make up approximately 75% of lower-risk MDS patient populations, many of whom are particularly vulnerable to poor clinical outcomes and have few other treatment options.

173. Defendant Grethlein thereafter discussed growth expectations for Rytelo, stating, in relevant part:

> First, we are pleased with the early awareness of RYTELO among prescribers and payers. Based on our market research before FDA approval in May of 2024 of over 100 U.S. hematologists and oncologists, over 80% of those surveyed were aware of imetelstat. One in 3 surveyed physicians indicated familiarity with the clinical data and a majority of these physicians look favorably on the efficacy profile and mechanism of action, which is especially important for a first-in-class treatment. Payers are expressing high levels of interest and already have a strong understanding of the RYTELO U.S. prescribing information and IMerge Phase 3 clinical data. From an operational perspective, both dosage strengths of RYTELO, the 188 mg vials and 47 mg vials were available in our distribution channel for customers to order from specialty distributors as of June 27, 2024. Our distribution network is fully activated with our specialty distributor network actively supporting customer demand across hospitals and community oncology clinics. Across the contiguous 48 states, RYTELO is available to HCPs within 24 to 48 hours from our specialty distribution networks. We also believe that RYTELO's inclusion in the updated NCCN guidelines has been important in spreading awareness among the prescriber community.
>
> * * *
>
> We believe that the strong RYTELO value proposition, commercial foundation and the execution of our entire organization is driving encouraging early results over these first 6 weeks of launch. As we commented earlier, we estimate that as of July 31, 2024, approximately 160 patients have received RYTELO. This demand was generated in part by reaching approximately 60% of top decile 1 through 4 accounts and includes orders from roughly 115 unique accounts. We are seeing an encouraging range of customers ordering RYTELO in these early days from small community to large aggregator accounts with hospitals ranging from community, academic centers, teaching hospitals and large health systems. In July, we kicked off our national speakers program with the launch of our national broadcast event featuring medical experts, which garnered over 300 medical professional participants. These events are a critical component of our marketing strategy to make sure HCPs are aware of the new treatment option for their eligible patients.

174. Later on the call, Defendant Robertson discussed the Company's financials, stating, in relevant part:

> Based on our current operating plans and assumptions, we believe that our existing cash, cash equivalents and marketable securities, together with our projected revenues from U.S. sales of RYTELO, will be sufficient to fund our projected operating requirements into the second quarter of 2026.

175. On September 9, 2024, the Company issued a press release regarding Defendant Ziegler. Following Defendant Kapur's departure from the Company, the press release noted ". . . the appointment of Jim Ziegler, as Executive Vice President, Chief Commercial officer, effective today, September 9, 2024." The release also stated that Defendant Ziegler was hired to ". . . spearhead Geron's global commercial strategy and operations, lead the commercial organization and be responsible for driving growth of RYTELO ™."

176. In addition to discussing Defendant Ziegler's addition to the Company, Defendant Scarlett stated, "Jim brings to Geron an impressive track record of operational excellence, having led multiple high performing teams through product launches. We are thrilled to welcome Jim at this critical time when RYTELO is commercially available in the U.S. and we are seeing encouraging uptake since its launch at the end of June 2024."

177. In further consideration of his appointment within the Company, Defendant Ziegler stated: "Geron already has a strong commercial organization and infrastructure in place, and I look forward to partnering with the team to drive a successful U.S. launch and the commercial potential of RYTELO."

178. The statements identified above, made from May 2, 2024 through September 9, 2024, were materially false and misleading and failed to disclose material adverse information required to make those statements not misleading. Among other things, Defendants did not reveal that: (i) Geron was not prepared for Rytelo's commercial launch, as it had no cohesive launch plan, no marketing materials, insufficient sales and medical staff, and no clear messaging about where Rytelo fit in treatment; (ii) Geron had not adequately educated the community physicians who were expected to be Rytelo's primary prescribers, and community physicians were not prescribing Rytelo in meaningful numbers; (iii) Rytelo's early uptake was driven largely by a bolus of later-

line patients treated by academic physicians as a last-resort therapy, rather than by first- and second-line patients; (iv) Rytelo's launch was hindered by its weekly monitoring requirement, existing competition, and a general lack of awareness of the treatment in the health care community; (v) by early September 2024, after the initial bolus of later-line patients had been exhausted, Geron's internal sales data showed that Rytelo sales and sales growth had begun to flatten; and (vi) as a consequence of the foregoing, the Company materially overstated Rytelo's commercial prospects, and the Individual Defendants' favorable representations regarding the Company's business, operations, and prospects were materially misleading and lacked a reasonable basis.

***November and December 2024 Statements***

179. On November 7, 2024, the Company issued a press release to disclose its financial results for the third quarter of 2024. The press release stated, in relevant part:

> "This has been a transformative year for Geron, following our first FDA approval and commercial launch of RYTELO in June. ***The initial full quarter of product revenue from our U.S. launch exceeded our expectations and demonstrates strong execution as a commercial company***. ***These results also reflect the high unmet need in lower-risk MDS and the compelling value proposition of RYTELO for hematologists and patients***, ***giving us confidence in future continued demand and momentum for RYTELO***," said [Defendant] Scarlett[.] "We were also pleased to announce this morning the completion of important synthetic royalty and debt financing transactions with Royalty Pharma and Pharmakon Advisors. We believe that the favorable terms in these transactions reflect the significant commercial potential of RYTELO and provide us with critical flexibility to fuel continued growth and invest in our future."
>
> Recent Business Highlights
>
> ***Strong execution in the first full quarter of U.S. launch, with net product revenue for RYTELO (imetelstat) of $28.2 million in the third quarter of 2024***.

180. On November 7, 2024, during an earnings call hosted by the Company (the "3Q24 Earnings Call"), Defendant Scarlett stated, in pertinent part:

> Following FDA approval and the commercial launch of RYTELO, our first-in-class telomerase inhibitor, this has been a transformative year for Geron. As a result, we believe we're well-positioned to build long-term commercial value with this product.
>
> ***In our first full quarter on the market in the United States, we achieved $28.2 million in RYTELO net product revenue, which exceeded our expectations***. The initial quarter of product revenue speaks to our execution as a commercial company, as well as the high unmet need in lower-risk MDS and the compelling value proposition of RYTELO for hematologists and patients. ***This gives us confidence in future continued demand and momentum for RYTELO***.
>
> Our strong IP position underlies the long-term commercial value proposition for RYTELO. We believe this IP position, including specific claims and our patents covering the indication that's in our FDA label and buttressed by the FDA's grant of orphan drug exclusivity for lower-risk MDS into June of 2031, will provide exclusivity in the United States through August of 2037.
>
> ***Today, our primary focus is on continuing to deliver on the initial success we achieved in the third quarter, getting RYTELO to more eligible lower-risk MDS patients and maximizing our opportunity in the U.S. market***. In Europe, we believe that the CHMP review of our RYTELO marketing authorization application in lower-risk MDS could be completed in late 2024 or early 2025 with potential EU approval in the first half of 2025. Subject to receiving this approval, we're continuing to prepare for the potential launch of RYTELO in the EU and are planning to commercialize RYTELO in select EU markets beginning in 2026.
>
> * * *
>
> ***In addition to this quarter's strong commercial performance, we were pleased to announce this morning a completion of both the synthetic royalty transaction and a debt financing transaction that together generated $250 million in gross proceeds. These transactions were comprised of $125 million capped synthetic royalty with Royalty Pharma and a $250 million committed senior secured debt facility with funds managed by Pharmakon Advisors, under which we've borrowed $125 million, allowing us to retire existing debt.***
>
> ***With this new debt facility, we also have access to an additional $125 million. We believe that the favorable terms we achieved in these transactions reflect the significant commercial potential of RYTELO and coming off a successful first quarter of commercial launch provide us with critical flexibility to fuel continued growth and investment in our future***. Michelle will provide more details on these transactions and on our Q3 results later on this call.

181. During the 3Q24 Earnings Call, Defendant Ziegler similarly highlighted what he characterized as Rytelo's early success, stating:

> As Chip highlighted, we achieved $28.2 million in RYTELO net product revenues in our first full quarter of U.S. sales. In the first few months of launch, ***demand has increased month-over-month with Q3 performance exceeding our expectations***.

182. Later in the 3Q24 Earnings Call, Defendant Ziegler stated, in pertinent part:

> ***Demand from launch through Q3 has come from 388 ordering centers, which represents approximately 45% of our key targeted accounts. This strong start reinforces the high unmet need in RYTELO's clinical profile in first line ESA ineligible and second line plus lower-risk MDS***.
>
> Our market research indicates treating physicians appreciate RYTELO's differentiated clinical profile in 24-week and one year red blood cell transfusion independent rates, median duration of red blood cell transfusion independence and hemoglobin rise. ***We believe RYTELO's strong clinical data support broad utilization across treatment eligible patient sub-groups in both community and academic settings***.
>
> * * *
>
> ***From our own internal demand sales data, so far, the RYTELO sales growth trajectory in the fourth quarter continues to be promising. Overall, we remain confident in our launch progress to date, continued demand for RYTELO, expected momentum into 2025 and the projected long-term growth of the brand***.
>
> * * *
>
> ***Our number one commercial priority is to deliver a strong U.S. launch. We are committed to keeping laser focused on that objective***. We plan to leverage our U.S. launch experience to also prepare for commercialization in select EU countries in 2026 and beyond.
>
> * * *
>
> In summary, I want to acknowledge the dedicated cross-functional teams at Geron for all their hard work to ensure that eligible U.S. patients have broad and timely access to RYTELO. I am inspired by how we have remained focused during this time of transition and I am optimistic in the future. ***We are very pleased with the strong demand for RYTELO across community and academic settings, favorable payer coverage policies and broad utilization across patient segments. These early launch dynamics reinforce our expectations for continued demand and promising growth***.

183. During the question-and-answer portion of the 3Q24 Earnings Call, in response to an analyst's question, Defendant Ziegler told investors: "So what we're looking at is -- and

expecting is steady, consistent growth across all of the patient segments. Specifically, second line in both RS negative and RS positive, first-line ESA-ineligible and then, of course, the relapsed/refractory third-line plus patients. We're not giving guidance at this point, but we are expecting steady and consistent growth going forward."

184. Later in the call, an analyst from Goldman Sachs asked whether the patients coming on to Rytelo were primarily second-line or third-line patients. Defendant Ziegler responded: "Again, we're not providing guidance, but in terms of our growth, what we expect is growth across all patient segments in both the academic and community setting. And what we provided on this earnings call is that 388 of our targeted accounts have ordered. So that's the breadth. Over time, what we're expecting is obviously to increase the breadth and depth of prescriptions or are prescribing RYTELO for patients across these accounts. So I'll just reinforce that we're seeing uptake in utilization across all patient segments, including first-line ESA ineligible, second-line and then third-line patients at this point."

185. A Stifel analyst also asked about the utilization split between academic and community prescribers. Defendant Ziegler answered: "The split between community and academic is 65-35 or roughly 2/3, 1/3."

186. On November 18, 2024, Defendant Scarlett was interviewed at the Stifel 2024 Healthcare Conference. Asked about Geron's outreach to community-based physicians, Scarlett stated: "I think we've been very gratified by what we've seen so far. So first of all, if you look across the landscape in the United States about, about 65% of the prescribing physicians in low risk MDS are in the community setting. And about 35% are academic in one form or another. That's exactly what we've seen so far. We've been seeing about two thirds of the patients appear to be coming from community settings and about a third come from academic settings."

187. When the analyst asked about the types of patients being prescribed Rytelo, Defendant Scarlett responded: "It looks like we're getting patients across all of the key segments that we would've expected, frontline ESA ineligible patients, in second line RS positive patients and RS negative patients. In particular, I'd say the RS negative, just because they make up more of the second line and because other products are not necessarily approved. We're certainly seeing our, our fair share, and then we do get third line patients as well."

188. On December 4, 2024, Defendant Scarlett was interviewed at the 7th Annual Evercore HealthCONx Conference. Asked what Geron was observing in the launch, Scarlett stated: "You're right, we had a bang up first quarter, John. We had a good solid beat on the initial consensus numbers. As we look ahead, we see strong continued growth." Scarlett added: "We've always been very strong in across the entire second line setting."

189. Asked whether community physicians had any lingering hesitancy, Defendant Scarlett responded: "I don't think we're seeing hesitancy." He continued: "So we're not seeing, I haven't really heard any resistance from that."

190. The statements made on November 7, 2024, November 18, 2024, and December 4, 2024, identified above, were materially false and misleading statements and failed to disclose material adverse information required to make those statements not misleading. Among other things, Defendants did not reveal that: (i) Geron's internal sales data showed that Rytelo sales and sales growth began to flatten in September 2024 and remained flat thereafter; (ii) Rytelo's early revenue was driven largely by a bolus of later-line patients treated by academic physicians as a last-resort therapy, rather than by first- and second-line patients; (iii) community physicians, who Defendants claimed accounted for roughly two-thirds of Rytelo patients, were not prescribing Rytelo in meaningful numbers because Geron had failed to educate them and lacked clear

messaging and positioning for the drug; and (iv) as a consequence of the foregoing, the Company materially overstated Rytelo's commercial prospects, and the Individual Defendants' favorable representations regarding the Company's business, operations, and future prospects were materially misleading and lacked a reasonable basis throughout the Relevant Period.

## THE TRUTH FINALLY EMERGES

191. On February 26, 2025, the Company disclosed its financial results for the fourth quarter and full year of 2024 through a press release, and that same day disclosed on its earnings call that Rytelo revenue had been flat for months, revealing slowing business momentum and stalled growth. In the press release, the Company stated, in pertinent part:

> Net Loss
>
> For the three and twelve months ended December 31, 2024, the Company reported a net loss of $25.4 million, ***or $0.04 per share***, and $174.6 million, or $0.27 per share, respectively, compared to $52.0 million, or $0.09 per share, and $184.1 million, or $0.32 per share, respectively, for the three and twelve months ended December 31, 2023.
>
> Revenues
>
> Total product revenue, net for the three and twelve months ended December 31, 2024, was ***$47.5 million*** and $76.5 million, respectively. There was no product revenue in the prior year periods, given that RYTELO was approved by the FDA in June 2024.
>
> Total net revenue for the three and twelve months ended December 31, 2024, was ***$47.5 million*** and $77.0 million, respectively, compared to $23,000 and $237,000 for the same periods in 2023. Total net revenue includes license fees and royalties in addition to any product revenue, net. The increase in revenue is due to product revenue from U.S. sales of RYTELO, which was approved by the FDA in June 2024.

192. During an earnings call hosted by the Company on the same day (the "4Q24 Earnings Call"), Defendant Scarlett stated:

> From a financial perspective, we ended the year with a strong cash position of approximately $503 million, which we expect will enable us to reach profitability

> without additional financing, if our internal sales and operating expense expectations are met.
>
> ***However, despite achieving this revenue in the first 2 quarters of launch, we have observed flat revenue trends over the last few months***. As many of you will recall, beginning a few months into launch, we changed our commercial and medical affairs leadership. Jim Ziegler, our Chief Commercial Officer; and Joe Eid, our EVP of R&D, will discuss their assessments and actions in more detail later in this call.

193. During the 4Q24 Earnings Call, Defendant Ziegler also addressed investors and stated:

> As described previously by [Defendant Scarlett], we achieved $47.5 million in RYTELO net product revenues in the fourth quarter 2024. This demand for RYTELO was supported by strong payer access. Payers responsible for approximately 80% of the U.S. covered lives have implemented medical coverage policies for RYTELO, that are consistent with the FDA label, clinical trials and/or NCCN guidelines.
>
> ***New patient starts and duration of treatment are the key primary drivers of revenue***. For duration of treatment, it is important to note that even the longest treated patients in the commercial setting are just hitting the median of approximately 8 months observed in the Phase III IMerge trial and our market research suggests the duration of treatment in commercial RYTELO patients treated to date appears consistent with that observed in IMerge.
>
> ***However, with respect to new patient starts, we have observed flatness over the past few months. Specifically, even though we see RYTELO being utilized across RS-negative and RS-positive first-line ESA ineligible, second-line ESA relapse refractory and third-line plus patients, the majority of new patient starts have come from the third-line plus patient segment with the second-line new patient starts lower than our expectations.***
>
> * * *
>
> We are also assessing other possible root causes for the flat revenue trends and have implemented or are in the process of implementing several changes such as scaling up our analytics capabilities, refining our segmentation and targeting and improving our promotional and sales force effectiveness, which we believe will help us more fully capture the significant commercial opportunity for RYTELO in lower-risk MDS, which I will speak to on the next slide.
>
> As shown on Slide 8 in our earnings deck, we estimate that in 2025, the U.S. RYTELO total addressable lower-risk MDS patient population is approximately 15,400 patients and includes patients recommended in the NCCN guidelines. This

> includes approximately 3,400 first line ESA ineligible patients, approximately 7,600 second line and 4,400 third line plus patients with approximately 75% of patients with RS negative and 25% of patients with RS positive status.
>
> As I mentioned, our efforts are particularly focused on the eligible RS-negative population where RYTELO is the only drug approved for ESA relapsed/refractory patients. Assuming the duration of treatment observed in IMerge and based on the current net price, ***there is potential to achieve blockbuster status by treating approximately 1/3 of the U.S. RYTELO, total addressable patients***.

194. Later in the 4Q24 Earnings Call, multiple analysts engaged the Individual Defendants in a question-and-answer discussion. The following exchange ensued:

> **Peter Richard Lawson, Barclays Bank PLC, Research Analyst**
> Maybe first question would just be around how we think about revenues, your commentary around flat revenues over the last few months. Whether you're seeing any week-over-week growth. And I've seen that comment kind of captures January and February. And then the other component would just be around how we think about 1Q revenues themselves, whether that's flat or growing versus 4Q, and then anything you can tell us around revenues and costs as we think about 2025?
>
> **Defendant Ziegler**
> Peter, so our ***revenues week-over-week have had some variability. But what I would say is our 4- and 8-week rolling averages underscore the flatness that I characterized on the call. And that flatness continued into the prior week leading up to this call. So it may be a little bit too early to make a full call on Q1 revenues, but I would characterize and reinforce what we said on the earnings call that the past couple of months have been relatively flat week-over-week in the 4- and 8-week averages.***
>
> * * *
>
> **Tara A. Bancroft, TD Cowen, VP & Senior Equity Research Analyst**
> So I was hoping you could give us maybe some more detail on the seasonality or patterns in general, not only that you're seeing with RYTELO, but it appears to be impacting MDS as a whole with luspatercept too. So I'm curious to get your thoughts on what's happening at a higher level in this indication? And then separately, maybe, Jim, if you could tell us more about the expected cadence of growth this year that we could see with your implemented changes that you suggested?
>
> * * *
>
> **Defendant Ziegler**
> [W]***e saw some seasonality beginning around the holidays, Thanksgiving more specifically. And there is some hesitancy in the market to start some of these***

***products that require, in our case, some monitoring. So there was a little bit of a delay***.

* * *

In terms of the expected cadence, it's really driven off of our business driver, right? We characterize the most important business driver for us is new patient starts. ***As you know, with launch products, often start in later line, third line plus, which we characterized on this call as seeing that's where the majority of our use was, even though we saw earlier line, second line, first-line use.***

So it really depends on our effectiveness in driving market share, not just in third-line plus, but in earlier line, second line and first-line opportunities. ***And our expectation is that as we increase our share of voice, our reach and frequency and together with medical affairs, increase education and awareness, we hope to see greater impact and use across all lines of therapy***. But it's not going to happen overnight. Share of voice and increasing the prescribing behaviors will take some time.

* * *

**Faisal Ali Khurshid, Leerink Partners LLC, Research Analyst**
On the trends that you've been seeing, could you comment on like how much of that was an impact on new patient starts as opposed to like discontinuations or dose modifications and holidays? I guess, the reason for the question is even if you're starting mostly in third-line patient, like shouldn't you be kind of like adding patients at a consistent rate? And I guess like people are also wondering like the duration of therapy should still be longer than like the time you've been in the market in third line as well? Or is that not the way to think about it?

**Defendant Ziegler**
Faisal, no, I think the way you're thinking about it is exactly right. The primary drivers are new patient starts and duration of treatment. What I said on the call is that duration of treatment at this point, while still early in that, we're only approaching the median duration of treatment in IMerge about right now. That does not appear to be issue based upon our own market research and KOL.

As you know, there isn't perfect data that we can cite only data that we triangulate around. But right now, at this point, we don't believe that duration of treatment is inconsistent with that seen in IMerge. ***And so we have seen some softness and it's related to new patient starts***.

I think the way to characterize it is we saw uptake and unmet need and the treatment was really with some of these early adopters who believe -- who understood and believed in the product and ***it's our obligation to really increase the reach and frequency, the share of voice amongst the majority of physicians who have yet to treat patients with RYTELO.***

* * *

**Gregory Allen Harrison, Scotiabank Global Banking and Markets, Analyst**
What feedback are you getting from KOLs and other providers around why they're not using RYTELO as much in earlier lines of therapy? And are there any differences based on setting as far as academic versus community? It sounds like from your comments just now that the bulk may be in academic?

**Defendant Scarlett**
Thanks, Greg. I think the first message that I would share with you is that our MD and our KOL feedback that have used RYTELO, very simply can be summarized as RYTELO works. ***And we see that in our market research and our one-on-one engagements with the KOLs. I think the biggest opportunity for us is to really increase the reach and frequency, our education and awareness and share of voice especially as you point out with the community***.

I'll just give you a very simple mathematic equation. So if you think about the 15,400 patients that we characterize as treatment eligible and you divide that by the number of MDS treating physicians in the U.S. It only leads to a couple of patients on average that each one of these physicians have. So it's really important for us to make sure that we get out to as many of these physicians in a cost-effective way through our sales team, our medical affairs team, and our nonpersonal efforts to really increase the share of voice.

* * *

**Emily Claudia Bodnar, H.C. Wainwright & Co., LLC, Vice President & Senior Healthcare Analyst**
I guess on the first one, in terms of new patient starts, are you mainly seeing prescribers who have already used RYTELO, kind of re-prescribe it to new patients? Or is it mostly coming from new prescribers, new centers?

* * *

**Defendant Ziegler**
***On new patient starts, we're seeing repeat prescriptions amongst the early adopters largely at many of the academic medical centers. In the community, it's a little bit more diffused***. So there, we're seeing more breadth than depth. But over time, as with other product launches, I expect that both breadth and depth will continue to grow, especially as physicians gain clinical experience and success with RYTELO.

* * *

**Kalpit R. Patel, B. Riley Securities, Inc., Senior Biotech Analyst**
Maybe first on the flattening over the past few months. Can you comment on exactly which month you started to see flattening? Was it the beginning of this year? Or was it the beginning of fourth quarter last year?

> **Defendant Ziegler**
> ***I would say based upon the rolling 4- and 8-week, we started to see right, let's call it, around the holidays, Thanksgiving holiday going forward***. We do see, as you know, in the weekly data, a lot of variability, which is why we incur more to the 4- and the 8-week rolling averages.

195. Following the disclosure of this information, Geron's stock price fell sharply, declining 32.07% in a single trading day. The price of Geron common stock dropped from a closing price of $2.37 per share on February 25, 2025, to a closing price of $1.61 per share on February 26, 2025.

## THE SECURITIES CLASS ACTION

196. On August 13, 2026, the Honorable Vince Chhabria of the U.S. District Court for the Northern District of California issued the Order denying the motion to dismiss the second amended complaint in the Securities Action. Order at 1.

197. The court noted that the plaintiffs in the Securities Action allege that the defendants made materially false or misleading statements, as alleged herein, on three occasions: Geron's November 7, 2024 earnings call for the third quarter of 2024, the November 18, 2024 Stifel Healthcare Conference, and the December 4, 2024 Evercore Conference. On each occasion, the defendants allegedly represented that overall fourth-quarter growth and Rytelo's uptake across patient segments, including first-line and second-line patients, continued to look promising through the end of 2024. *Id*.

198. The court held that the plaintiffs had adequately alleged that these statements were false or misleading when made. *Id*. at 2. In particular, the court found that the allegations attributed to a former Geron sales executive supported the conclusion that contemporaneous sales data showed by November 2024 that Rytelo's early revenue was largely driven by a "bolus of later-line patients with no other treatment option," and that sales growth had flattened before November 2024 because "Rytelo was primarily being prescribed by academics as a last resort treatment and

was not being used as a second-line treatment option." *Id*. The court further noted that this former executive allegedly confirmed the problem through a firsthand review of the sales data after joining Geron. *Id*.

199. According to the court, these allegations support the plaintiffs' interpretation of Defendant Ziegler's statement during the February 26, 2025 earnings call that, based on four- to eight-week rolling averages, Geron executives "started to see" slowed growth "around the holidays, Thanksgiving holiday going forward." *Id*.

200. The court also held that the plaintiffs had adequately pleaded that the defendants made the statements with knowledge of their falsity or with deliberate recklessness. *Id*. (*citing Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 991 (9th Cir. 2009)). The court relied on allegations that Defendant Ziegler approached the former executive "in October 2024 about joining Geron to help Ziegler figure out how to restart Rytelo sales growth" because "Ziegler's own review of Geron's weekly sales data, as well as Ziegler's attendance at medical conferences and interviews of physicians and Geron's sales representatives," had led him to believe that "sales and sales growth had flattened." *Id*. The court concluded: "That is sufficient to allege that Ziegler knew that sales had slowed before November 2024." *Id*. at 2–3.

201. The court further reasoned that, because Geron's "core operations" centered on Rytelo's commercial success, it could be inferred that other Geron executives were also aware that sales had slowed in the fall of 2024, particularly given the allegations that Geron executives were "motivated to conceal and misrepresent the failed commercial launch of Rytelo to position Geron as an acquisition target." *Id*. at 3 (*citing Construction Laborers Pension Trust of Greater St. Louis v. Funko Inc.*, 166 F.4th 805, 831 (9th Cir. 2026)).

202. As a result of the Order, the Securities Action is proceeding against Geron and Defendants Scarlett and Ziegler.

## INSIDER SALES

203. Rather than disclose material information to the market, the Insider Selling Defendants used their access to Geron's material non-public information to sell their personal holdings while the Company's stock remained artificially inflated. As officers of the Company, the Insider Selling Defendants were entrusted with, and had access to, material, non-public information concerning Geron's lack of readiness for Rytelo's commercial launch, including that Geron had no cohesive launch plan, no marketing materials, insufficient sales and medical staff, and no clear messaging about where Rytelo fit in treatment, and that it had not adequately educated the community physicians who were expected to be Rytelo's primary prescribers.

204. While in possession of material non-public information, Defendant Grethlein sold 674,348 shares of Geron stock for gross proceeds of approximately $3,073,004 before the truth emerged. These sales were timed to capitalize on Geron's artificially inflated stock price. Defendant Grethlein made these sales on July 8, 2024, as set forth below:

| TRADE DATE | WEIGHTED AVG. PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 07/08/2024 | $4.557 | 674,348 | $3,073,004 |
| TOTAL | | 674,348 | $3,073,004 |

205. While in possession of material non-public information, Defendant Feller sold 287,900 shares of Geron stock for gross proceeds of approximately $1,334,128 before the truth emerged. These sales were timed to capitalize on Geron's artificially inflated stock price. Defendant Feller made these sales on June 10, 2024, as set forth below:

| TRADE DATE | WEIGHTED AVG. PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 06/10/2024 | $4.634 | 287,900 | $1,334,128 |

| TRADE DATE | WEIGHTED AVG. PRICE | QUANTITY | VALUE |
|---|---|---|---|
| TOTAL | | 287,900 | $1,334,128 |

206. While in possession of material non-public information, Defendant Kapur sold 421,875 shares of Geron stock for gross proceeds of approximately $1,959,609 before the truth emerged. These sales were timed to capitalize on Geron's artificially inflated stock price, and were made approximately six weeks before the Company announced that Defendant Kapur would depart as Chief Commercial Officer. Defendant Kapur made these sales on June 10, 2024, as set forth below:

| TRADE DATE | WEIGHTED AVG. PRICE | QUANTITY | VALUE |
|---|---|---|---|
| 06/10/2024 | $4.645 | 421,875 | $1,959,609 |
| TOTAL | | 421,875 | $1,959,609 |

207. In total, the Insider Selling Defendants sold approximately $6.37 million (gross proceeds) of Geron stock at artificially inflated prices while in possession of material, non-public information.

## DAMAGES TO GERON

208. As a direct and proximate result of the Individual Defendants' misconduct, Geron has incurred, and will continue to incur, losses and expenses amounting to millions of dollars.

209. Such expenditures include, but are not limited to, legal fees associated with the Securities Action, as well as any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

210. These losses also include, but are not limited to, substantial compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, such as bonuses linked to the Company's achievement of specific objectives, as well as other benefits provided to those Individual Defendants.

211. As a direct and proximate result of the Individual Defendants' actions, Geron has suffered and will continue to suffer damage to its reputation and goodwill, along with a "liar's discount" that will negatively impact the Company's stock in the future. This is due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

212. Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

213. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

214. Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.

215. Plaintiff understands her obligation to hold stock throughout the duration of this action and is prepared to do so.

216. During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of some or all of the Director Defendants.

217. Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

218. The Company's Board is currently comprised of eight members: Defendants Bir, McDonald, Molineaux, O'Farrell, Spiegel, and non-defendants Semerjian, Andrews, and Chinoporos. Thus, Plaintiff is only required to show that at least half of the Board, i.e., four directors, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

219. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and is therefore not a disinterested party.

220. Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and is a principal beneficiary of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

221. Additionally, the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendants O'Farrell (Chair) and McDonald**

222. Defendants O'Farrell (Chair) and McDonald are not disinterested or independent and, therefore, are incapable of considering demand because they serve as members of the Audit Committee. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, inter alia, accounting, legal, regulatory, and public disclosure requirements. Thus, these Defendants were responsible for

knowingly or recklessly allowing the improper statements. Further, these Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge, these Defendants caused these improper statements to be issued.

223. For these reasons, Defendants O'Farrell (Chair) and McDonald breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

**All Directors**

224. The Directors, as members of the Board, were and are subject to the Code of Conduct as well as the Company's Corporate Governance Guidelines (the "Codes"), which go well beyond the basic duties required by applicable laws, rules, and regulations. Specifically, the Codes require Directors to act in good faith, responsibly, with due care, avoid conflicts of interest, ensure accurate and timely disclosures, and promptly report any violations. The Director Defendants violated these Codes because they knowingly or recklessly permitted the Company to issue materially false and misleading statements alleged herein. Consequently, the Director Defendants breached the Company's Codes, face substantial liability, and are not independent or disinterested, making demand upon them futile.

225. Furthermore, demand, in this case, is excused because the Director Defendants, who are named as defendants in this action, constitute a majority of the Board, control the Company and are indebted to each other. The Directors have longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately assessing and managing risks, overseeing the Company's internal control over financial reporting, overseeing disclosure controls and

procedures and calling into question the Individual Defendants' conduct. Thus, any demand upon the Directors would be futile.

226. Geron has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Geron any part of the damages Geron suffered and will continue to suffer, thereby. Thus, any demand to the Directors would be futile.

227. The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

228. The acts complained of herein constitute violations of fiduciary duties owed by Geron's officers and directors, and these acts are incapable of ratification.

229. The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Geron. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-

versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of Geron, there would be no directors' and officers' insurance protection. Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

230. If there is no directors' and officers' liability insurance, then the Directors will not cause Geron to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

231. Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, certainly at least four of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

### COUNT I

### Breach of Fiduciary Duty
### Against the Individual Defendants

232. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

233. Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Geron's business and affairs.

234. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants

intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of Geron's shareholders.

235. In breach of their fiduciary duties owed to Geron, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

236. The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Geron's securities.

237. The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Geron's securities.

238. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

239. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Geron has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

240. Plaintiff, on behalf of Geron, has no adequate remedy at law.

## COUNT II

### Violations of Section 14(a) of the Exchange Act Against Defendants Scarlett, McDonald, Spiegel, Aggarwal, Bir, O'Farrell, Lawlis, and Molineaux

241. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

242. Pursuant to Section 14(a) of the Exchange Act, "[i]t shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

243. Rule 14a-9, promulgated under Section 14(a) of the Exchange Act, prohibits proxy statements from containing "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

244. In the exercise of reasonable care, Defendants Scarlett, McDonald, Spiegel, Aggarwal, Bir, O'Farrell, Lawlis, and Molineaux should have known that, by misrepresenting or

failing to disclose the foregoing material facts, the statements contained in the 2024 Proxy were materially false and misleading. The misrepresentations and omissions were material to Geron's shareholders in voting on the matters set forth for stockholder determination in the 2024 Proxy, including, but not limited to, election of directors, ratification of an independent auditor, and the approval (on an advisory basis) of executive compensation.

245. The false and misleading 2024 Proxy caused the re-election of Defendants Scarlett, McDonald, and Spiegel at the May 9, 2024 annual meeting, allowing them to continue breaching their fiduciary duties to Geron, and caused shareholders to approve, on an advisory basis, the compensation of the Company's named executive officers.

246. As a direct and proximate result of the material misrepresentations and omissions in the 2024 Proxy, which was filed during the Relevant Period, the Company suffered damages.

247. Plaintiff, on behalf of Geron, has no adequate remedy at law.

## COUNT III

**Breach of Fiduciary Duty – Misappropriation of Material, Non-Public Information Against the Insider Selling Defendants**

248. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

249. At the time that the Insider Selling Defendants sold their Geron stock, they knew the material, non-public information described above and sold stock motivated, in whole or in part, by the substance of such information.

250. The information described above was proprietary, non-public information concerning the Company's financial condition and future business prospects. It was a proprietary asset belonging to the Company, which the Insider Selling Defendants misappropriated to their own benefit when they sold Geron stock.

251. The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of their fiduciary duties of loyalty and good faith.

252. Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, any profits made by the Insider Selling Defendants as a result of their stock sales should be disgorged and the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

253. Plaintiff, on behalf of Geron, has no adequate remedy at law.

## COUNT IV

**Unjust Enrichment**
**Against the Individual Defendants**

254. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

255. By their wrongful acts, violations of law, and false and misleading statements and omissions of material information and facts that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Geron.

256. Each of the Defendants received payment from Geron, in the form of either salary or director fees, while actively breaching their fiduciary duties to Geron.

257. All the payments and benefits provided to Defendants were at the expense of Geron. The Company received no benefit from these payments.

258. Plaintiff, as a shareholder and a representative of Geron, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from benefits, and other compensation, including any performance-based or valuation-based

compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

259. Plaintiff, on behalf of Geron, has no adequate remedy at law.

## COUNT V

### Waste of Corporate Assets
### Against the Individual Defendants

260. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

261. As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused Geron to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

262. As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

263. Plaintiff, on behalf of Geron, has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a) Declaring that the Plaintiff may maintain this action on behalf of Geron and that Plaintiff is an adequate representative of the Company;

b) Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Geron;

c) Determining and awarding to Geron the damages sustained by it, or disgorgement or restitution owed to it, as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d) Directing the Individual Defendants to take all necessary actions to reform and improve Geron's corporate governance and internal procedures to comply with applicable laws and to protect Geron and its shareholders from a repeat of the damaging events described herein;

e) Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

f) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

Dated: November 4, 2026

**BIELLI & KLAUDER, LLC**

*/s/ Ryan M. Ernst*
Ryan M. Ernst, Esquire (No. 4788)
1204 N. King Street
Wilmington, DE 19801
Telephone: (302) 803-4600
rernst@bk-legal.com

-and-

OF COUNSEL:
JUSTIN A. KUEHN
MOLLY J. BROWN
**KUEHN LAW, PLLC**
53 Hill Street, Suite 605
Southampton, NY 11968
Telephone: (833) 672-0814
justin@kuehn.law

*Attorneys for Plaintiff*